UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

IN RE:

        CHANCE & ANTHEM, LLC,

                Debtor.

_____/

Case No. 18-16248-MAM

Chapter 7

## MOTION FOR SANCTIONS AGAINST CHAPTER 7 TRUSTEE AND ITS COUNSEL

COMES NOW Jeffrey M. Siskind ("Movant"), and requests that the Court impose sanctions against the Chapter 7 Trustee and its counsel for the making of intentional misrepresentations to the Court, and states:

1.      In two separate papers which were filed in this case, the Chapter 7 Trustee, by and through its counsel, stated that Movant admitted during the 341 Meeting of Creditors that it commingled the Debtor's assets in Movant's attorney trust account, which statements were false and were intentionally made to intimidate and harm Movant.

2.      These false statements appeared in paragraph no. 4 of Docket Entry No. 113, entitled *Chapter 7 trustee's Omibus Response to Objections to Retention of Ex-Parte Application of Accountant filed by Jeffrey M. Siskind [ECF No. 99 & 100],* filed August 3, 2018 (attached as "Exhibit A"), and in paragraph no. 2 of Docket Entry No. 139, entitled *Chapter 7 trustee's response in Opposition to Emergency Motion for Protective Order Prohibiting release of Confidential Client Financial Information [ECF No. 121],* filed August 24, 2018. (attached as "Exhibit B").

3.      Notwithstanding the breadth of protection under Florida's expansive litigation privilege, there is no privilege or protection afforded to one who or on whose behalf intentional

misrepresentations which violate the duty of candor to the tribunal are made, as here.

4. In this matter, as demonstrated by the attached docket entries wherein the Chapter 7 Trustee, by and through its counsel, made representations which are disproved by the transcript of the 341 Meeting of Creditors (filed at Docket Entry No. 139, and attached hereto as "Exhibit C"), and which instead evidence Movant's exculpatory testimony.

WHEREFORE, Movant requests the imposition of sanctions against the Chapter 7 Trustee and its counsel, as follows; the striking of each paper in which the said intentional misrepresentations were made and an admonishment of both the Chapter 7 trustee and its counsel.

**S I S K I N D   L E G A L**

    */s/ Jeffrey M. Siskind*
Jeffrey M. Siskind, Esquire
FBN 138746
3465 Santa Barbara Drive
Wellington, FL  33414
TEL    (561) 791-9565
FAX    (561) 791-9581
Email: jeffsiskind@msn.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing paper will be served upon the filing hereof on all parties registered on CM/ECF, listed below, this 8th day of October, 2018 and by U.S. Mail upon unregistered parties shown on the attached official mailing matrix.

    */s/ Jeffrey M. Siskind*
Jeffrey M. Siskind, Esquire
FBN 138746

**18-16248-MAM Notice will be electronically mailed to:**

Robert C Furr
danderson@furrcohen.com, rcf@trustesolutions.net

John H Genovese, Esq on behalf of Trustee Robert C Furr
jgenovese@gjb-law.com, hburke@gjb-law.com;gjbecf@gjb-law.com;gjbecf@ecf.courtdrive.com;jzamora@gjb-law.com

Steven S Newburgh on behalf of Creditor 3485 Lago De Talavera Trust
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Creditor Carl Stone
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Creditor Christopher George
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Creditor David Fiore
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Creditor Dianna George
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Creditor Frederick Volkwein
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Steven S Newburgh on behalf of Other Professional George W. Liebmann
snewburgh@mclaughlinstern.com,
ssn@newburghlaw.net;mgarcia@mclaughlinstern.com;bgonzalez@mclaughlinstern.com;nsolomon@mclaughlinstern.com;vrhaburn@mclaughlinstern.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Jeffrey M Siskind on behalf of Debtor Chance & Anthem, LLC
jeffsiskind@msn.com, jmsesq500@gmail.com

Jeffrey M Siskind on behalf of Interested Party Jeffrey M Siskind
jeffsiskind@msn.com, jmsesq500@gmail.com

Jesus M Suarez on behalf of Trustee Robert C Furr
jsuarez@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;ecastellanos@gjb-law.com;gjbecf@ecf.courtdrive.com

Stuart A Young, Esq on behalf of Creditor 27120 Ocean Gateway, LLC
syoung@ybplaw.com

Stuart A Young, Esq on behalf of Creditor Alan Bias
syoung@ybplaw.com

**18-16248-MAM Notice will not be electronically mailed to:**

Alan Barbee
GlassRatner Advisory & Capital Group
1400 Centrepark Blvd #860
West Palm Beach, FL 33401

Robert Grossbart on behalf of Creditor David Fiore
Grossbart, Portney & Rosenberg
One N. Charles Street.
Suite 1214
Baltimore, MD 21201

Robert Grossbart on behalf of Creditor Frederick Volkwein
Grossbart, Portney & Rosenberg
One N. Charles Street.
Suite 1214
Baltimore, MD 21201

Richard P. Zaretsky on behalf of Creditor Sarenil Associates
1615 Forum Pl #3-A
West Palm Beach, FL 33401

Richard P. Zaretsky on behalf of Creditor Frederick Volkwein
1615 Forum Pl #3-A
West Palm Beach, FL 33401

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                          Case No. 18-16248-BKC-MAM

CHANCE & ANTHEM, LLC,                            Chapter 7

     Debtor.

_____/

**CHAPTER 7 TRUSTEE'S OMNIBUS RESPONSE TO**
**OBJECTIONS TO RETENTION OF *EX-PARTE* APPLICATION OF ACCOUNTANT**
**FILED BY JEFFREY M. SISKIND [ECF No. 99 & 100]**

ROBERT C. FURR, the Chapter 7 Trustee for the above-styled Debtor, Chance & Anthem, LLC (the "Debtor"), files his Response to the Objection to Trustee's Application to Employ Alan R. Barbee, CPA & GlassRatner Advisory & Capital Group, LLC [ECF No. 98], filed by Jeffrey Siskind (as amended) on behalf of the Debtor [ECF Nos. 99 & 100] (the "Objection"), and says:

**Introduction**

1.      By this filing, the Trustee responds to the Objection filed by Jeffrey Siskind on behalf of the Debtor to the Trustee's proposed retention of Alan R. Barbee, CPA and GlassRatner Advisory & Capital Group, LLC (the "Accountants").

2.      Mr. Siskind lacks authority to prosecute the Objection on behalf of "the Debtor." Additionally, Mr. Siskind's objections lack merit under the circumstances. The objection appears to be nothing more than part of Mr. Siskind's practice of making bare-bones filings intended to delay, hamper and/or frustrate the administration of the bankruptcy estate and needlessly cause parties to incur litigation costs.

3.    The Debtor purports to have been in the medical cannabis business through its alleged ownership of CannaMed Pharmaceuticals, LLC ("CannaMed").  Mr. Siskind has valued the Debtor's interest CannaMed at over $28 million.  [ECF No. 24].  Yet, on the Petition Date, the Debtor only had $48 in its checking account and approximately $150 worth of office equipment.  *Id.*  To date, Mr. Siskind has refused to provide any meaningful information to substantiate the value of the Debtor's alleged interest in CannaMed, or provide a single piece of evidence to suggest that the Debtor was anything more  than an artifice designed to enrich Jeffrey Siskind.

4.    On June 9, 2018, the Trustee conducted and adjourned, without objection, a Section 341 Meeting of Creditors in this case.  Mr. Siskind appeared to testify on behalf of the Debtor.  Mr. Siskind was generally evasive, claiming not to recall the source or use of many of the Debtor's assets and liabilities.  Mr. Siskind claimed not to posses any records of the Debtor, despite being its former counsel and sole control person.  Perhaps most troubling, Mr. Siskind admitted to commingling Debtor assets in his attorney trust account and under the purported auspices of a "transfer account."  Mr. Siskind also claimed that all of his records and trust account ledgers had been stolen by a rogue paralegal and that no backups were available. Accordingly, it is necessary to employ the Accountants to, among other things, reconstruct the Debtor's books and records and analyze transfers between the Debtor and a number of entities controlled by Mr. Siskind.

5.    For example, the Debtor's bankruptcy schedules reflect that it received in excess of $1.3 million from third parties purportedly to assist it with its cannabis business and other ventures.  It appears that, from a preliminary analysis of the Debtor's banking records, the

Debtor fraudulently transferred significant assets to Mr. Siskind or to third parties for his benefit. This review is ongoing and aided by the services of the Accountants.

### Mr. Siskind Lacks Standing

6.      Mr. Siskind is the former sole member and managing member of the Debtor.  He also served as the Debtor's pre-petition bankruptcy counsel and as counsel in numerous litigation and legal matters.[a]  Mr. Siskind filed the Objection purportedly on behalf of "the Debtor, by and through its undersigned counsel" and requests relief on behalf of "Debtor" so that that "creditors may properly assess whether the application is sufficient".  *See* Objection at Prefatory and Conclusory clauses.

7.      In a corporate bankruptcy filing, the appointed Chapter 7 trustee has extensive powers and responsibilities relating to the liquidation of the bankruptcy estate. 11 U.S.C. §§701 et seq.  The Supreme Court confirmed the breadth of this authority in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985)(holding, *inter alia,* that the debtor's directors could not "exercise the traditional management function of controlling the corporation's attorney-client privilege," and the trustee could waive the privilege over the directors' objections). *Id*. at 353, 358, 105 S.Ct. 1986.

8.      In *Weintraub*, the Supreme Court found that once a corporation is in bankruptcy, "[t]he powers and duties of a bankruptcy trustee are extensive," with the Bankruptcy Code giving the trustee "wide-ranging management authority over the debtor." *Id*. at 352, 105 S.Ct. 1986.  Further, the Supreme Court stated:

> "In contrast, the powers of the debtor's directors are severely limited. Their role is

---

[a] Mr. Siskind was a Chapter 11 debtor before this Court for nearly five years.  *In re Siskind,* Case No. 13-13096-BKC-PGH..

3

> to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are 'completely ousted."

*Id*. at 352–53, 105 S.Ct. 1986 (citations omitted); see also *Log Furniture, Inc. v. Call*, 180 F. App'x 785, 787–88 (10th Cir. 2006)("[t]he Code makes no provision within the structure of Chapter 7 for "former management" to appear in the proceeding and attempt to control the property of the estate or assert a separate interest on behalf of the Debtor. The whole notion that the contrary is true is antithetical to the basic concept of a corporate liquidating bankruptcy under Chapter 7 of the Code.").

9.      Mr. Siskind has not been retained by the Trustee to appear as counsel for the Debtor.  Indeed, as the sole member and managing member of the Debtor, he would never be "disinterested" as required by section 327(a) of the Bankruptcy Code.  His appearance on behalf of the Debtor is *ultra vires* and should be disregarded by the Bankruptcy Court.

10.      Mr. Siskind is also precluded from appearing in his capacity as the Debtor's former managing member.   "Typically, a debtor has no standing to object to claims or orders relating to them because the debtor does not have a pecuniary interest in the distribution of the assets of the estate."  *In re Walker,* Case No. 03-32158-BKC-PGH (Order Dated June 20, 2006 at p. 21); *quoting In re Kieffer-Mickes, Inc.*, 226 B.R. 204, 208 (B.A.P. 8th Cir. 1998)(additional citations omitted).  Here, the bankruptcy schedules executed and filed by Mr. Siskind reveal that the Debtor is hopelessly insolvent and there is no reasonable possibility at this time of a surplus. See, e.g., , *In re Air Safety Int'l, L.C.*, 336 B.R. 843, 857 at FN 12 (S.D. Fla. 2005)(A debtor has standing to challenge a bankruptcy court's decision in a Chapter 7 case only when the estate will

be left with a surplus); citing *In re Nangle*, 288 B.R. 213, 216 (8th Cir. BAP 2003) ("[i]f the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order"), *aff'd per curiam*, 83 Fed.Appx. 141 (8th Cir.2003).

11. The Trustee respectfully requests that Mr. Siskind be ordered to refrain from making any further appearances in this Court or any other Court on behalf of the Debtor, Chance & Anthem, LLC.

## The Objection

12. In one breath, Mr. Siskind complains that the proposed retention of the Accountants should be conditioned on additional disclosures concerning their billing and training practices, as well as additional explanation as to how the Accountants purport to staff this matter. Objection at ¶ 3. Yet in another breath, Mr. Siskind admits that the Accountants are qualified and that the rates expressed in the Application "appear reasonable at first glance." *Id*.

13. The Accountants are well-known in the Southern District of Florida. Their retention, on terms identical to those proposed here, has been routinely approved without objection. There is no rule, statute or decisional authority that requires the Accountants to respond to Mr. Siskind's meandering curiosity about their business practices. Additionally, the Trustee's business judgment with respect to the retention of estate professionals should only be challenged in the rarest of cases and under circumstances not applicable here. *In re Smith*, 507 F.3d 64, 71 (2d Cir. 2007) (quotations omitted).

14. Mr. Siskind also complains that Mr. Barbee's rate is not explicitly disclosed. Objection at ¶4. For the avoidance of doubt, Mr. Barbee is a senior principal at Glass Ratner

and his hourly rate is $450 per hour. *See* Application at ¶7. The Accountants, as well as the Trustee and all other estate professionals, acknowledge and understand that all requests for compensation are subject to application and Bankruptcy Court approval.

15.     The Trustee notes that ,at the present time, the Debtor has zero cash assets and is administratively insolvent.

**WHEREFORE**, the Trustee respectfully requests the Court overrule the Objection filed by Jeffrey Siskind on behalf of the Debtor, preclude Mr. Siskind from acting on behalf of the Debtor, grant the proposed retention of the Accountants under the terms and conditions set forth in its application *nunc pro tunc* to the date when services were first rendered, and for such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted this 3rd day of August, 2018.

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Chapter 7 Trustee Robert C. Furr*
100 S.E. Second Street, 44th Floor
Miami, Floirda 33131
Telephone: (305) 349-2300
Telecopier: (305) 349-2310

By: /s/  *Jesus M. Suarez*
      Jesus M. Suarez, Esq.
      Florida Bar No. 60086
      jsuarez@gjb-law.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via CM/ECF Notification to all parties registered to receive electronic notice (which is incorporated herein by reference) on this 3rd day of August, 2018.

    /s Jesus M. Suarez
    Jesus M. Suarez, Esq.

## SERVICE LIST

***Parties to receive electronic notice via CM/ECF***

Robert C Furr
danderson@furrcohen.com, rcf@trustesolutions.net

John H Genovese, Esq on behalf of Trustee Robert C Furr
jgenovese@gjb-law.com, hburke@gjb-law.com;gjbecf@gjb-law.com;gjbecf@ecf.courtdrive.com

Steven S. Newburgh on behalf of Creditor 3485 Lago De Talavera Trust
snewburgh@mclaughlinstern.com

Steven S. Newburgh on behalf of Creditor Carl Stone
snewburgh@mclaughlinstern.com

Steven S. Newburgh on behalf of Creditor Christopher George
snewburgh@mclaughlinstern.com

Steven S. Newburgh on behalf of Creditor David Fiore
snewburgh@mclaughlinstern.com

Steven S. Newburgh on behalf of Creditor Dianna George
snewburgh@mclaughlinstern.com

Steven S. Newburgh on behalf of Creditor Frederick Volkwein
snewburgh@mclaughlinstern.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

**Via E-Mail**

Jeffrey Siskind (jeffsiskind@msn.com)

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                              Case No. 18-16248-BKC-MAM

CHANCE & ANTHEM, LLC,                               Chapter 7

          Debtor.
_____/

**CHAPTER 7 TRUSTEE'S RESPONSE IN OPPOSITION TO
EMERGENCY MOTION FOR PROTECTIVE ORDER PROHIBITING RELEASE OF
CONFIDENTIAL CLIENT FINANCIAL INFORMATION [ECF NO. 121]**

ROBERT C. FURR, the Chapter 7 Trustee for the above-styled Debtor, Chance &
Anthem, LLC (the "Debtor"), files his Response to the Emergency Motion for Protective Order
Prohibiting the Release of Confidential Client Financial Information [ECF No. 121] (the
"Motion"), filed by Jeffrey Siskind, and says:

**Introduction**

1.       The Debtor purports to have been in the medical cannabis business (perhaps
among others) through its alleged ownership of CannaMed Pharmaceuticals, LLC
("CannaMed").  Mr. Siskind has valued the Debtor's purported interest CannaMed at over $28
million.  [ECF No. 24].  Yet, on the Petition Date, the Debtor only had $48 in its checking
account and approximately $150 worth of office equipment.  *Id.*  To date, Mr. Siskind has failed
to provide any meaningful information to substantiate the value of the Debtor's alleged interest
in CannaMed, or provide a single piece of evidence to suggest that the Debtor was anything
more than an artifice designed to enrich Jeffrey Siskind.

2.       On June 9, 2018, the Trustee conducted and adjourned, without objection, a
Section 341 Meeting of Creditors in this case.  Mr. Siskind appeared to testify on behalf of the

Debtor.  Mr. Siskind was generally evasive, claiming not to recall the source or use of many of the Debtor's assets and liabilities.  Mr. Siskind claimed not to posses any records of the Debtor, despite being its former counsel and sole control person.  Perhaps most troubling, Mr. Siskind admitted to commingling Debtor assets in his attorney trust account and under the purported auspices of a "transfer account."

3.      Mr. Siskind also claimed that all pertinent records and trust account ledgers had been stolen by a rogue paralegal.  *See* 07/09/18 341 Hr'g Trans., a copy of which is annexed hereto as Exhibit "A" ("341 Trans.") at pp. 11:18-24; 12:1-9; 27:8-14.

4.      Accordingly, it is necessary for the Trustee to reconstruct the trust account records to evaluate whether the Debtor has any claims that arise form transactions involving Mr. Siskind's trust account.  The Debtor allegedly had only one single bank account at JP Morgan Chase (the "Debtor Account").   *See* Schedule A at ECF Nos. 11, 59.   Nonetheless, Siskind testified to utilizing his trust account for transactions involving the Debtor in at least three separate instances where the proceeds of said transactions cannot be reconciled with banks statements.

5.      The first instance relates to a mortgage owned by the Debtor that Siskind sold to his business associate Frank Zokaites for $25,000 on October 12, 2017.  This transaction was not disclosed in the Debtor's Statement of Financial affairs.  *See*  ECF No. 11.  Nonetheless, when Mr. Siskind was asked about this transaction at the Debtor's 341 meeting, he testified that monies generated from the sale were deposited in his law firm through a "transfer account." Yet, those cannot be reconciled with a contemporaneous transfer from the trust account to the Debtor's Bank Account.  *See* 341 Trans. at pp. 16:23-18:9.

Q.     What consideration did Chance & Anthem receive for the sale of that note and mortgage, if any?

A.     The tot -- Frank Zakitis who bought that note and mortgage, is that what you mean?

Q.     Yes.

A.     Received, I believe, a total of $25,000.

**Q.     Who received $25,000?**

**A.     I'm thinking that it went into the law firm, yeah.**

Q.     So when you sold Chance & Anthem's $25,000 mortgage and promissory note, Frank Zakitis paid your law firm $25,000?

A.     Well, I'm certain that he paid the 25 -- well, not a hundred percent certain of the amount, **but approximately $25,000, and I believe they all went through a transfer account into my law firm.**

Q.     Okay.

MR. FURR:

Q.     What's a "transfer account"?

THE WITNESS:

A:     It's just an account that was set up to handle transactions between the law firm and Frank Zakitis.

Q.     And is that a separate account?

A.     Yeah.
Q.     And where is that account located?

A.     PNC Bank.

Q.     What's the name of the account?

A.     Siskind Legal Services, LLC.

> Q:    And it's only used to transfer monies between your law firm and other parties?
>
> A:    That's why it originally existed. Frank Zakitis is located in Pittsburgh, and when he would pay bills, he would pay them at PNC.  He kept the account at PNC down here.
>
> Q:    And that PNC account, is that still open?
>
> A.     Yeah.

6.    Mr. Siskind also testified that money purportedly invested by Carl Stone in the Debtor was deposited in his attorney trust account.  Again, those funds cannot be reconciled with a corresponding deposit in the Debtor Bank Account.  341 Trans. at p. 19:2-15 (emphasis supplied).

> Q:    Who were those private lenders?
>
> A:    I believe one member was Richard Niff, and another one was Carl Stone and/or David Fiore.
>
> Q.    Were monies from Richard Niff and David Fiore deposited into Chance & Anthem's bank account at J.P. Morgan?
>
> A.    I don't believe so, no.
>
> Q.     All right. Where were those monies funded from for that purchase?
>
> A.    Oh, I think one was. Yeah, I think Mr. Neff's money did go through the Chance & Anthem account. Don't hold me to that, but I'm pretty sure that's where that, and then **Carl Stone's money was deposited into my attorney trust account.**

7.    Mr. Siskind also testified that money purportedly invested by Mr. Volkwein in the Debtor was also deposited in his attorney trust account.  And yet again, those funds cannot be reconciled with a corresponding deposit in the Debtor Bank Account. 341 Trans. at p. 25:2-25 (emphasis supplied).

> Q:    And how much money did Mr. Volkwein lend to Chance & Anthem?

A.    Well, according to my records $500,000.

Q.    All right, and how was that loan documented?

A.    I don't remember. I remember that I have a or had a power of attorney from Mr. Volkwein. Those funds came from properties that he sold at some point, which my firm handled the sale transaction of.

Q.    And where were the funds loaned by Mr. Volkwein deposited?

A.    I don't recall. **I imagine they ran through my trust account**, since we did the closing. Well, we didn't do the closing, but we represented him in the closing of the sale of properties he had in West Palm Beach.

Q.    And you represented him in the loan that he made to Chance & Anthem?

A.    No, I don't believe so.

Q.    Was he represented by anyone in connection with the loan he made to Chance & Anthem?

A.    No.

Q.    What were the terms of the loan he made to Chance & Anthem?

A.    I don't remember.

8.    Finally, Siskind testified that his attorney trust account bank records were used by him to prepare reconciliations of transactions involving the Debtor.  The reconciliations, however, are now missing and Siskind has no ability to produce contemporaneous records to identify these transactions.

Q.    And what were Mr. Volkwein's $500,000 used for?

A.    I don't recall. At some point the history of his interest, I provided him with paperwork on that, but beyond that you'd have to ask him.

Q.    What paperwork did you provide him?

A.    Just a disbursement sheet as to where his money was used.

Q.      How was that disbursement sheet generated?

A.      By hand by me.

Q.      And what documents would you have reviewed to generate that disbursement sheet?

A.      It was more or less a ledger that I kept on him that I would update from time to time.

Q.      What documents would you use to create that ledger?

A.      Just my bank records at the time.

Q.      The bank records of Chance & Anthem?

A.      I don't remember whether I ever utilized Chance & Anthem's records to facilitate that report, no.

**Q.      Would those have been your trust account records?**

**A.      Some would have been, yeah.**

Q.      All right. So other than your trust account records and Chance & Anthem records, if at all, what other records would you have reviewed to create that ledger?

A.      I don't remember what bank account records, were involved in the review, but the one-page report that I gave was accurate.

Q.      Whatever happened to that ledger?

A.      It was with the books and records that were in my files when we vacated the office at 525 South Flagler.

Q.      Those are the ones that you've testified Mr. Gibson took possession of?

A.      I believe he removed them, yes.

Q.      Have you filed a police report for the 16 missing files?

A.      No, I didn't think the police report would be availing, because I did give him permission to take all of the dead files, and the understanding was the

6

> live files would come out to the project house in Santa Barbara, and the
> dead files, rather than discard them, he would remove and keep in his
> garage at his house.

9.      In the Motion, Siskind protests that his attorney trust account records should be
protected from production because the release of this information is "contrary to and violates the
confidentiality and reasonably expected protection of proprietary information afforded to the
undersigned's legal clients by virtue of the attorney-client relationship."  Motion at ¶3.

10.     As a threshold matter this argument should be viewed in the light of the
fundamental principle that "the party invoking the privilege has the burden of establishing the
existence of the attorney-client relationship and the confidential nature of the communication."
*In re Grand Jury Proceedings* (*Freeman*), 708 F.2d 1571, 1575 (11th Cir.1983), citing United
States v. Kelly, 569 F.2d 928, 938 (5th Cir.) cert. denied 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d
123 (1978).  Mr. Siskind fails to make either show.  And he cannot.  There are no
communications between Mr. Siskind and any of his alleged clients.

11.     Additionally, the fact that transfers occurred in and out of a bank account is not a
fact protected by the attorney-client privilege.  See, *Upjohn Co. v. United States*, 449 U.S. 383,
395, 101 S. Ct. 677, 685, 66 L. Ed. 2d 584 (1981)(the attorney-client privilege only protects
disclosure of communications; it does not protect disclosure of the underlying facts by those who
communicated with the attorney).

12.     Additionally, the Trustee's forensic accountants have identified the following
transactions that require additional review of the trust account records including  (1) a cash
deposit in the amount of $725,000 on October 22, 2015; (2) numerous deposits from the trust
account into the Debtor's Bank Account totaling over $200,000; (3) a check from the Debtor's

7

Bank Account in the amount of $5,000 to the trust account; and (4) a $750,000 deposit on October 6, 2015 into the Debtors account, of a cashier's check issued by Wells Fargo Bank NA that indicates Jeffrey Siskind is the remitter.

13.     The Trustee is entitled to examine the providence of these deposits, including the source of funds originating from the trust account trust account and the disposition of assets Mr. Siskind has testified were deposited in his trust account but belonged to the Debtor.  Also, there are additional numerous cash withdrawals and deposits in and out of the Debtor's Bank Account that remain unreconciled.

14.     The Trustee's counsel attempted to confer with Mr. Siskind regarding the relief sought in his Motion in order to devise an appropriate protocol to review the subject records. The Trustee is not, however, required to accept Mr. Siskind's representations as to the nature and extent of the transactions involving his trust account.   A copy of the communication is annexed as Exhibit "B".

**WHEREFORE**, the Trustee respectfully requests the Court deny the Motion, and for such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted this 24th day of August, 2018.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Attorneys for Chapter 7 Trustee Robert C. Furr*
100 S.E. Second Street, 44th Floor
Miami, Floirda 33131
Telephone: (305) 349-2300
Telecopier: (305) 349-2310

By: /s/  *Jesus M. Suarez*
        Jesus M. Suarez, Esq.
        Florida Bar No. 60086
        jsuarez@gjb-law.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF Notification to all parties registered to receive electronic notice and/or U.S. Mail as indicated on the attached Service List on August 24, 2018.

  /s Jesus M. Suarez
Jesus M. Suarez, Esq.

## SERVICE LIST

***Parties to receive electronic notice via CM/ECF***

Robert C Furr
danderson@furrcohen.com, rcf@trustesolutions.net

John H Genovese, Esq on behalf of Trustee Robert C Furr
jgenovese@gjb-law.com, hburke@gjb-law.com;gjbecf@gjb-law.com;gjbecf@ecf.courtdrive.com;jzamora@gjb-law.com

Steven S. Newburgh: snewburgh@mclaughlinstern.com

Office of the US Trustee: USTPRegion21.MM.ECF@usdoj.gov

Jeffrey M Siskind on behalf of Debtor Chance & Anthem, LLC
jeffsiskind@msn.com, jmsesq500@gmail.com

Jeffrey M Siskind on behalf of Interested Party Jeffrey M Siskind
jeffsiskind@msn.com, jmsesq500@gmail.com

Jesus M Suarez on behalf of Trustee Robert C Furr
jsuarez@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;ecastellanos@gjb-law.com;gjbecf@ecf.courtdrive.com

9

**Parties to receive notice via U.S. Mail**

Alan Barbee
1400 Centrepark Blvd #860
West Palm Beach, FL 33401

Robert Grossbart on behalf of Creditor David Fiore
Grossbart, Portney & Rosenberg
One N. Charles Street.
Suite 1214
Baltimore, MD 21201

# EXHIBIT "A"

1          UNITED STATES BANKRUPTCY COURT
           SOUTHERN DISTRICT OF FLORIDA
2

3

IN RE:                    CASE NO. 18-16248-MAM
4

 CHANCE & ANTHEM, LLC
5

           Debtor.
6 _____/

7

8               341 MEETING OF CREDITORS

9                 July 9, 2018

10         The above-entitled cause came on for a Section

11 341 Meeting of Creditors before ROBERT FURR, one of the

12 trustees in the UNITED STATES BANKRUPTCY COURT, in and for

13 the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler

14 Dr., West Palm Beach, Palm Beach County, Florida on July

15 9, 2018, commencing at or about 8:30 a.m., and the

16 following proceedings were had.

17

18

19

20

21         Transcribed from a digital recording by:
               Cheryl L. Jenkins, RPR, RMR
22

23

24

25

Page 2

APPEARANCES:

ROBERT FURR, Trustee

GENOVESE JOBLOVE & BATTISTA, by
JESUS M. SUAREZ, Esquire
On behalf of the Trustee

TRENT SWIFT, Esquire
On behalf of Richard Niff

MAX ARESTY, Esquire
On behalf of Frederick Volkwein

SOFIYE WILLIAMS, Esquire
On behalf of Carl Stone
- - - - - - -

WITNESS
Jeffrey Siskind                     Page
  Examination by Mr. Furr           3
  Examination by Mr. Suarez        11
  Examination by Mr. Swift         31
  Examination by Mr. Aresty        33
  Examination by Mr. Williams      37

```
 1                    MR. FURR:  Trustee calls Case
 2   Number 18-16248, Chance & Anthem, LLC.
 3                    MR. SISKIND:  Do you want me on this side,
 4   Robert?
 5                    MR. FURR:  Right there is fine.
 6                    Please raise your right hand.
 7                    Do you swear to tell the truth, the whole
 8   truth and nothing but the truth?
 9                    MR. SISKIND:  I do.
10   Thereupon,
11                         JEFFREY SISKIND,
12   having been first duly sworn, was examined and testified
13   as follows:
14                    MR. FURR:  For the record I've verified
15   Mr. Siskind's address, and identity and will return it
16   back to him, and I also know him.
17                            EXAMINATION
18   BY MR. FURR:
19          Q.    Please state your name.
20          A.    Jeffrey Mark Siskind.
21          Q.    Mr. Siskind, what's your position with
22   Chance & Anthem?
23          A.    I was the managing member.
24          Q.    Did you file this bankruptcy up in Baltimore
25   originally?
```

1    A.    In Maryland, yes.

2    Q.    In Maryland.  Are you still the managing

3  member?

4    A.    Well, that's a legal question.  I guess you

5  could answer it better than I can.  I was the last

6  managing member.

7    Q.    Okay.  No one -- you didn't resign?

8    A.    No, I did not.

9    Q.    In Baltimore you filed the petition, and

10  when you signed the petition, did you sign it?

11    A.    Yes.

12    Q.    As the managing member?

13    A.    Either as that or counsel to the ---

14    Q.    Okay.  I just see your signature on there on

15  February the 12th, 2018.  That's your signature?

16    A.    Well, the petition had my signature.

17    Q.    Let me just show you, make sure you

18  understand.

19    A.    Yes.

20    Q.    The one right there.  Okay, and the

21  information in the original petition, summary of assets,

22  schedules of assets, were those true and correct?

23    A.    To the best of my knowledge at the time,

24  yes.

25    Q.    Do you wish to make any amendments to those

1    schedules?

2         A.    We're going to make amendments, yes.

3         Q.    Okay, and you say "we", does that mean

4    somebody else with you?

5         A.    The company "we".  I should say I.

6         Q.    Right.  Can you tell me when Chance & Anthem

7    was formed?

8         A.    No, I don't remember when it was formed, but

9    it's on the SunBiz site.

10        Q.    Okay, and did you form it?

11        A.    Yes.

12        Q.    So what in these schedules is inaccurate

13   that you listed on the original schedules, petition and

14   statement of financial affairs, or are you going add more

15   information to it?

16        A.    We're going to add information, but I

17   remember that there was a date that was incorrect as to

18   when we vacated a property in Maryland that the company

19   was utilizing.

20        Q.    All right.  Has Chance & Anthem ever filed

21   tax returns?

22        A.    No, it never made any money.

23        Q.    I didn't ask that.  I said, did it ever file

24   tax returns --

25        A.    No.

1      Q.     -- and you should know.

2             Okay.  There was a tax return -- there was a

3      significant claim filed, one claim filed in the case so

4      far by Del Marva Power in Carney's Point, New Jersey.  It

5      looks like a power company.

6      A.     Correct.

7      Q.     And this is an electric bill for property at

8      27120 Ocean Gateway, or Gtwy, in Hebron, Maryland.  Can

9      you tell me, are you familiar with that address?

10     A.     Certainly.

11     Q.     And what is that, what building or property

12     is located there?

13     A.     There is a 47,000-square foot building,

14     approximately, located on just under seven acres, which

15     the company had a lease purchase agreement --

16     Q.     Okay.

17     A.     -- on.

18     Q.     And who are they lease purchasing it from?

19     A.     27120 Ocean Gateway, LLC.

20     Q.     Who owns that company, that was Ocean

21     Gateway company you just mentioned?

22     A.     That company is owned by a fellow by the

23     name of Alan Bias.

24     Q.     How do you spell Mr. Bias' last name?

25     A.     B-i-a-s.

```
 1          Q.    And who is Mr. Bias, do you know him?

 2          A.    Yes.

 3          Q.    Business associate of yours?

 4          A.    No, except for that deal.

 5          Q.    Okay.  A total third party?

 6          A.    Yes, arm's length third party.

 7          Q.    And then was there actually a written lease

 8   for that?

 9          A.    There was a lease option agreement, yes.

10          Q.    And do you have a copy of that lease option

11   agreement?

12          A.    I don't know if I still have a copy, but I'm

13   sure that Mr. Bias would be more than willing to give it

14   to you.

15          Q.    And can you tell me the terms of the lease

16   option agreement?

17          A.    I think it was monthly payments of about

18   7,361, if my memory serves me correctly, and then there

19   was an option for a buyout at, I think it was 700,000.  It

20   might have been 750,000.

21          Q.    And did you pay a down payment on that lease

22   option when you signed it?  I assume you signed it on

23   behalf of Chance & Anthem?

24          A.    Yes.

25          Q.    So when you signed it, did you put down
```

1    $100,000, 50,000, or some amount of money as a deposit?

2           A.    I think we put down $300,000 when the

3    building was purchased.

4           Q.    Okay.  So was the building actually in the

5    name of Chance & Anthem?

6           A.    Never.

7           Q.    So it wasn't purchased?

8           A.    The building was purchased by 27120 Ocean

9    Gateway, LLC from a company, a gas company up there that

10   owned it.

11          Q.    Okay, and so ---

12          A.    Wait a minute.  If my memory serves me

13   correctly, that's the way it was structured.

14          Q.    Okay, and so you put the $300,000 down, you

15   being Chance & Anthem?

16          A.    Well, I believe Chance & Anthem put that

17   money down.

18          Q.    Okay, and so the building was not purchased

19   in Chance & Anthem's name?

20          A.    No.

21          Q.    The name of the other company?

22          A.    Correct.  Well, let me think about that.  I

23   guess it would have to have been yeah.  Yes, yes.

24          Q.    Okay, and who is occupying that building

25   today?

1          A.    I have no idea.

2          Q.    When was the last time you were there?

3          A.    I don't remember, whenever I thought that we

4    vacated it, I guess, is the last time.

5          Q.    At the height of your occupancy, or Chance &

6    Anthem's occupancy of the building, if I went there, would

7    I find a staff of people working there?

8          A.    Yes.

9          Q.    Would I find the marijuana growing

10   operation?

11         A.    It would have been.  It was not.  There were

12   no plants on site.

13         Q.    But that's what you were going to do in the

14   building, was grow marijuana in it?

15         A.    Correct.

16         Q.    But you never did?

17         A.    Correct.

18         Q.    So what did you actually do there other than

19   just open up an office?

20         A.    We were renovating the building.

21         Q.    Okay.  How much did you spend on the

22   renovation?

23         A.    I don't remember.

24         Q.    Would it be Chance & Anthem that spent the

25   money?

```
 1          A.    I believe so.

 2          Q.    Would Chance & Anthem's bank records, the

 3  bank checkbook show the payments for the renovation?

 4          A.    It should.  It might not show all of them,

 5  but there were payments to individuals who were working on

 6  the site, subcontractors, you should see those, yeah.

 7          Q.    And those -- was there a separate checking

 8  account in Maryland for that purpose?

 9          A.    No.

10          Q.    Just the checking account for the company

11  here that you've already provided us?

12          A.    Yeah, there were no other accounts in other

13  -- out of state.

14          Q.    Are there any other unpaid utility bills

15  such as this?

16          A.    Utility bills?

17          Q.    Yes.

18          A.    Well, let's see, there is a little over $800

19  due a trash disposal company.

20          Q.    Right.

21          A.    And are you asking that question regarding

22  that specific property only?

23          Q.    No, anything.

24          A.    Anything, okay.  There is a pool service

25  company that's owed money, $600.
```

```
 1          Q.    Pool service?

 2          A.    Uh-huh.

 3          Q.    Did the company have a swimming pool?

 4          A.    No, the project that we had in Florida,

 5   which was the renovation of a house, has a pool.

 6          Q.    Okay.  Did Chance & Anthem own a house in

 7   Florida in was renovating?

 8          A.    Yes.

 9          Q.    Did it actually have a house in its name?

10          A.    I believe so.

11          MR. FURR:  I've got an attorney here,

12   Mr. Suarez, who is going to ask you a few questions.  I'm

13   going to turn it over to him, and then there may be some

14   creditors here.  You're also welcome to ask questions if

15   you are a creditor.

16                           EXAMINATION

17   BY MR. SUAREZ:

18          Q.    So, Mr. Siskind, good morning.  We've met

19   before.  My name is Jesus Suarez.  My firm is proposed

20   counsel to the Chapter 7 trustee.

21              Does Chance & Anthem have any books and

22   records?

23          A.    There were books and records which were

24   removed from my office at one point in time, yes.

25          Q.    Where were they moved to?
```

1      A.    I don't know.

2      Q.    Who removed them?

3      A.    Robert Gibson.

4      Q.    All right, and why did Mr. Gibson remove

5  them?

6      A.    He took all my files.  He was supposed to

7  only take the dead files, but when I went into the

8  cabinet, which I thought contained my live files, it was

9  empty.

10      Q.    All right, and did you ever use a computer

11  to transact business for Chance & Anthem or send emails on

12  behalf of ---

13      A.    Correspondence, emails, yes.

14      Q.    From what email address?

15      A.    Just from my personal address.

16      Q.    What email address is that?

17      A.    JeffSiskind@msn.com.

18      Q.    Did you use any other electronic form of

19  communication on behalf of Chance & Anthem?

20      A.    No.

21      Q.    In the debtor's schedules you listed a

22  computer, a printer and a monitor belonging to Chance &

23  Anthem with an estimated value of $150.

24      A.    Correct.

25      Q.    Where is that right now?

```
 1            A.    The last I saw it it was in the facility in
 2   Maryland.
 3            Q.    What facility in Maryland is that?
 4            A.    The building that we were talking about,
 5   which is located at 27120 Ocean Gateway.
 6            Q.    And was that facility vacated before April
 7   of 2018?
 8            A.    Yes.
 9            Q.    All right.  So the last time you saw those
10   books and records was before April of 2018?
11            A.    No, that's the last time I saw the computer.
12   I don't remember when the last time I saw the books and
13   records was.
14            Q.    I'm sorry, the computer.
15            A.    Yes.
16            Q.    Where is that computer right now?
17            A.    I have no idea.
18            Q.    You left it in the warehouse in Maryland?
19            A.    As I stated, the last time I saw it it was
20   in the warehouse in Maryland.
21            Q.    All right, and you turned over the warehouse
22   in Maryland to Ocean Gateway, is that correct?
23            A.    Yes.
24            Q.    All right, and at that time ---
25            A.    When you say Ocean Gateway, you mean the
```

1   LLC, 27120 Ocean Gateway, LLC?

2           Q.    Owned by Mr. Bias.

3           A.    I believe it's owned by Mr. Bias.  It's, I

4   believe, a Fla -- well, it might be a Maryland limited

5   liability company, but they have the same sort of on-line

6   service that you can check to get whatever information you

7   need about it.

8           Q.    Do you have any interest in that entity?

9           A.    No.

10                MR. FURR:  Do you have a phone number for

11  Mr. Bias?

12                THE WITNESS:  No.  I do, I can get it for

13  you.

14                MR. FURR:  Would you please get that for

15  me --

16                THE WITNESS:  Sure.

17                MR. FURR:  -- so I can contact him.

18  BY MR. SUAREZ:

19          Q.    On October 12th, 2017, Chance & Anthem

20  transferred and assigned a promissory note and mortgage

21  encumbering property in Cross Creek, owned by Mr. and

22  Mrs. Emmet Tias (phonetic) and Zoreda Mohammed (phonetic).

23  Are you familiar with them?

24          A.    Sure.

25          Q.    All right.  How did the debtor come to own

1    that note and mortgage?

2         A.    The debtor bought that note and mortgage

3    from an individual lender named George Maylor (phonetic).

4         Q.    And how much did the debtor pay for that

5    note and mortgage?

6         A.    $27,250.

7         Q.    And where did that money come from?

8         A.    I don't recall.

9         Q.    Would it have been paid from the debtor's

10    bank account at JP Morgan?

11         A.    I think so.  I'm not totally positive, but

12    probably.

13         Q.    All right.  If it wasn't paid from the

14    debtor's bank account at J.P. Morgan, where would it have

15    been paid from?

16         A.    I don't know.  It might have been my law

17    office account.

18         Q.    All right, and when would it have been paid

19    from by your law office account?

20         A.    I have no idea why ---

21         Q.    Was your law office account holding monies

22    for Chance & Anthem?

23         A.    Not that I recall, but we represented George

24    Maylor, and of course we also represented Chance & Anthem,

25    which I owned a hundred percent of.

1      Q.    When you say "we", who is "we"?

2      A.    The company "we".  Forgive me, I always say

3    that.  I.

4      Q.    Who is the company "we"?

5      A.    Siskind Legal.

6      Q.    Is that an LLC?

7      A.    Siskind Legal Services, LLC did exist at one

8    time, but it's lapsed.

9      Q.    All right.  So when you say that the

10   company, we, paid for Chance & Anthem's purchase of this

11   mortgage, that it came from the law firm, what law firm is

12   that?

13     A.    Well, it's my law firm, if it indeed came

14   from there.  I'd have to look.

15     Q.    Okay.  So it might have come from somewhere

16   else?

17     A.    It could have, but it's not hard to figure

18   out where it came from.  I'm sure I have a record of that

19   check.

20     Q.    And you represented Chance & Anthem in that

21   transaction?

22     A.    Correct.

23     Q.    What consideration did Chance & Anthem

24   receive for the sale of that note and mortgage, if any?

25     A.    The tot -- Frank Zakitis who bought that

1   note and mortgage, is that what you mean?

2         Q.    Yes.

3         A.    Received, I believe, a total of $25,000.

4         Q.    Who received $25,000?

5         A.    I'm thinking that it went into the law firm,

6   yeah.

7         Q.    So when you sold Chance & Anthem's $25,000

8   mortgage and promissory note, Frank Zakitis paid your law

9   firm $25,000?

10         A.    Well, I'm certain that he paid the 25 --

11   well, not a hundred percent certain of the amount, but

12   approximately $25,000, and I believe they all went through

13   a transfer account into my law firm.

14         Q.    Okay.

15               MR. FURR:  What's a "transfer account"?

16               THE WITNESS:  It's just an account that was

17   set up to handle transactions between the law firm and

18   Frank Zakitis.

19               MR. FURR:  And is that a separate account?

20               THE WITNESS:  Yeah.

21               MR. FURR:  And where is that account

22   located?

23               THE WITNESS:  PNC Bank.

24               MR. FURR:  What's the name of the account?

25               THE WITNESS:  Siskind Legal Services, LLC.

1          MR. FURR:  And it's only used to transfer

2    monies between your law firm and other parties?

3          THE WITNESS:  That's why it originally

4    existed.  Frank Zakitis is located in Pittsburgh, and when

5    he would pay bills, he would pay them at PNC.  He kept the

6    account at PNC down here.

7          MR. FURR:  And that PNC account, is that

8    still open?

9          THE WITNESS:  Yeah.

10          MR. FURR:  Sorry.

11   BY MR. SUAREZ:

12          Q.   On August 25th, 2015, the debtor bought real

13   estate at 3445 Santa Barbara Drive, is that correct?

14          A.   I'm not sure of the date, but that's the

15   project house that we were talking about.

16          Q.   All right, and what do you mean by the

17   "project house"?

18          A.   It's a house that was purchased from

19   J.P. Morgan Chase to renovate and sell.

20          Q.   And what was the source of funds used to

21   purchase that house?

22          A.   I don't remember exactly, but we paid

23   approximately $1,250,000 for it.

24          Q.   Where did that million two fifty come from?

25          A.   I don't remember.  Give me a moment.  I can

```
1    probably think.  Private lenders.
2              Q.    Who were those private lenders?
3              A.    I believe one member was Richard Niff, and
4    another one was Carl Stone and/or David Fiore.
5              Q.    Were monies from Richard Niff and
6    David Fiore deposited into Chance & Anthem's bank account
7    at J.P. Morgan?
8              A.    I don't believe so, no.
9              Q.    All right.  Where were those monies funded
10   from for that purchase?
11             A.    Oh, I think one was.  Yeah, I think
12   Mr. Neff's money did go through the Chance & Anthem
13   account.  Don't hold me to that, but I'm pretty sure
14   that's where that, and then Carl Stone's money was
15   deposited into my attorney trust account.
16             Q.    Were those investments in Chance & Anthem
17   documented?
18             A.    Sure.
19             Q.    How were they documented?
20             A.    I don't remember.
21             Q.    Did you represent Chance & Anthem in
22   documenting those transactions?
23             A.    Well, there was no one else to represent
24   Chance & Anthem, so I guess you could say that I did.
25             Q.    Did you represent Mr. Neff in documenting
```

1   those transactions?

2          A.    No.

3          Q.    Did you represent Mr. Stone or Mr. Fiore in

4   documenting those transactions?

5          A.    No.

6          Q.    Have you ever represented Mr. Stone or

7   Mr. Fiore?

8          A.    No, as to Stone.  Yes, as to Fiore.

9          Q.    All right.  Did you represent Mr. Fiore in

10  any matters related to Chance & Anthem?

11         A.    Not that I recall, no.

12         Q.    Chance & Anthem took a mortgage out from New

13  Wave Loans Residential, LLC in about November of 2015 --

14         A.    I don't recall --

15         Q.    -- is that correct?

16         A.    -- the date, but that was a mortgage that we

17  borrowed, yeah, against the project house.

18         Q.    When you say "we", who do you mean "we"?

19         A.    Chance & Anthem.

20         Q.    Okay, and where were those funds deposited?

21         A.    I don't remember.

22         Q.    Would they have been deposited at the

23  debtor's bank account at J.P. Morgan?

24         A.    I don't remember.

25         Q.    Is there anywhere else, besides the debtor's

1    bank account, where they would have been deposited?

2            A.    I don't remember where they were deposited.

3            Q.    All right, and what were those funds used

4    for?

5            A.    They were used toward the Maryland marijuana

6    growing project.

7            Q.    What you say the marijuana growing project

8    in Maryland, do you mean the marijuana project that

9    Cannamed Pharmaceuticals was --

10           A.    Correct.

11           Q.    -- operating?

12                 In March ---

13           A.    Well, let's stop, not operating, but

14   developing.

15           Q.    Okay, developing.

16                 What was the difference between the debtor

17   and Cannamed Pharmaceuticals, what did the debtor do in

18   Maryland, and what did Cannamed Pharmaceuticals do?

19           A.    The debtor owns 70 percent of Cannamed

20   Pharmaceuticals.

21           Q.    Okay.  Is the debtor's ownership in Cannamed

22   Pharmaceuticals documented in any way?

23           A.    It was.

24           Q.    How?

25           A.    There is a certificate of, I don't know what

1    you call it, because it's an LLC, a unit interest

2    certificate.

3            Q.    And where is that ---

4            A.    With the files that are missing.

5            Q.    Did you ever have those on a computer?

6            A.    No.

7            Q.    Did you ever email them to anybody?

8            A.    No.  When you saw "them", you're talking

9    about the certificates --

10          Q.    The certificates.

11          A.    -- in favor of ---

12          Q.    Sure.

13          A.    No.

14          Q.    Who owned the other 30 percent of Cannamed?

15          A.    I personally own 5 percent, still do.  An

16    individual by the name of Bruce Lowe owns 5 percent, and

17    the rest I don't recall.

18          Q.    On March 23rd of 2016 there was a mortgage

19    recorded in favor of EBK South Properties, LLC against the

20    Santa Barbara house --

21          A.    Correct.

22          Q.    -- for about a half a million dollars,

23    $500,000.

24          A.    No.  There was a line of credit, I think the

25    actual borrowing against that house was, if memory serves

1   me correctly, 160,000.

2        Q.   And where were those $160,000 deposited?

3        A.   I don't remember, but the funds were used

4   for Cannamed.

5        Q.   For Cannamed?

6        A.   On behalf of -- yeah, payment of Cannamed

7   expenses, to the best of my recollection.

8        Q.   Were the funds deposited in Chance &

9   Anthem's account at J.P. Morgan?

10       A.   I don't remember where those were deposited.

11       Q.   Why was Chance & Anthem funding Cannamed's

12  expenses?

13       A.   Because that was the agreement, Chance &

14  Anthem assisted -- Cannamed had no income, so Chance &

15  Anthem provided all the funding that Cannamed needed.

16       Q.   Why was Cannamed incapable of procuring that

17  funding for itself?

18       A.   It was more or less a shell company.

19       Q.   Did Chance & Anthem ever have any income?

20       A.   No.

21       Q.   Did Chance & Anthem have any business

22  operations?

23       A.   Other than what we've discussed, no.

24       Q.   Did Chance & Anthem ever sell anything?

25       A.   That one mortgage that we spoke about.

1      Q.    Did Chance & Anthem ever produce anything?

2      A.    What do you mean by produce?

3      Q.    Did it ever make anything?

4      A.    Actually make a tangible product, no.

5      Q.    Okay.  You said there was an agreement

6  between Chance & Anthem and Cannamed?

7      A.    Yes.

8      Q.    How was that agreement documented?

9      A.    There was a document which required Chance &

10 Anthem to fund Cannamed in exchange for its unit

11 interests.

12     Q.    And where can I find that document?

13     A.    With all the other documents that are taken

14 from my office by Mr. Gibson.

15     Q.    That document was never scanned?

16     A.    No.

17     Q.    Was never emailed to anybody?

18     A.    Not that I recall, no.

19     Q.    So it would only have ever existed in a hard

20 file?

21     A.    Yes, and it was a one-page piece of paper, I

22 remember looking at it.

23     Q.    Whose Fredrick Volkwein?

24     A.    He is a valid creditor of Chance & Anthem.

25 He's an individual who I've known for probably 30 years

```
 1    here in West Palm Beach.

 2         Q.    And how much money did Mr. Volkwein lend to

 3    Chance & Anthem?

 4         A.    Well, according to my records $500,000.

 5         Q.    All right, and how was that loan documented?

 6         A.    I don't remember.  I remember that I have a

 7    -- or had a power of attorney from Mr. Volkwein.  Those

 8    funds came from properties that he sold at some point,

 9    which my firm handled the sale transaction of.

10         Q.    And where were the funds loaned by

11    Mr. Volkwein deposited?

12         A.    I don't recall.  I imagine they ran through

13    my trust account, since we did the closing.  Well, we

14    didn't do the closing, but we represented him in the

15    closing of the sale of properties he had in West Palm

16    Beach.

17         Q.    And you represented him in the loan that he

18    made to Chance & Anthem?

19         A.    No, I don't believe so.

20         Q.    Was he represented by anyone in connection

21    with the loan he made to Chance & Anthem?

22         A.    No.

23         Q.    What were the terms of the loan he made to

24    Chance & Anthem?

25         A.    I don't remember.
```

1      Q.     Who would know?

2      A.     I would know if I had the ability to look at

3   the file, but -- or Fred would know.

4      Q.     And what were Mr. Volkwein's $500,000 used

5   for?

6      A.     I don't recall.  At some point the history

7   of his interest, I provided him with paperwork on that,

8   but beyond that you'd have to ask him.

9      Q.     What paperwork did you provide him?

10      A.     Just a disbursement sheet as to where his

11   money was used.

12      Q.     How was that disbursement sheet generated?

13      A.     By hand by me.

14      Q.     And what documents would you have reviewed

15   to generate that disbursement sheet?

16      A.     It was more or less a ledger that I kept on

17   him that I would update from time to time.

18      Q.     What documents would you use to create that

19   ledger?

20      A.     Just my bank records at the time.

21      Q.     The bank records of Chance & Anthem?

22      A.     I don't remember whether I ever utilized

23   Chance & Anthem's records to facilitate that report, no.

24      Q.     Would those have been your trust account

25   records?

1          A.      Some would have been, yeah.

2          Q.      All right.  So other than your trust account

3    records and Chance & Anthem records, if at all, what other

4    records would you have reviewed to create that ledger?

5          A.      I don't remember what bank account records

6    were involved in the review, but the one-page report that

7    I gave was accurate.

8          Q.      Whatever happened to that ledger?

9          A.      It was with the books and records that were

10   in my files when we vacated the office at 525 South

11   Flagler.

12         Q.      Those are the ones that you've testified

13   Mr. Gibson took possession of?

14         A.      I believe he removed them, yes.

15         Q.      Have you filed a police report for the

16   missing files?

17         A.      No, I didn't think the police report would

18   be availing, because I did give him permission to take all

19   of the dead files, and the understanding was the live

20   files would come out to the project house in Santa

21   Barbara, and the dead files, rather than discard them, he

22   would remove and keep in his garage at his house.

23         Q.      What's the current status of the project

24   house?

25         A.      The project house is owned by a company

```
 1    controlled by Frank Zakitis, and it has been sitting

 2    because of permit issues, but I understand that the plans

 3    were just approved, and the permit should be issued today

 4    or later this week.

 5            Q.    What's your current involvement with the

 6    project house?

 7            A.    I don't have any official involvement with

 8    that house.  It's located next to my house, so I do keep

 9    an eye on it.

10            Q.    What's your unofficial involvement with the

11    house?

12            A.    Just keep an eye on it.

13            Q.    Do you have any interest in the house?

14            A.    No.

15            Q.    Do you have any agreement with Mr. Zakitis

16    concerning the disposition of that house?

17            A.    Nothing in writing.

18            Q.    Do you have any agreement that's not in

19    writing concerning the disposition of that house?

20            A.    Well, nothing that's enforceable since it

21    pertains to real estate, and would be barred by the

22    statute of frauds if it wasn't in writing.

23            Q.    That's not the question I'm asking.  I'm

24    asking what the agreement is.

25            A.    There is no official agreement.  I hope that
```

1    Frank will make some money on the house when he sells it,

2    and that he will do something for my creditors.

3         Q.    Okay.  Well, considering that Mr. Furr is

4    the trustee of those creditors, we'd like to know what the

5    unofficial agreement is, or what understanding you might

6    have, or what your expectation might be of what

7    Mr. Zakitis will do once he sells the house.

8         A.    I don't have any expectation.  There is no

9    articulated agreement at this point.

10        Q.    Is there an unarticulated agreement?

11        A.    No.

12        Q.    Okay.  Well, you've defined it as an

13   articulated agreement.  I was simply trying to define

14   whether there was an unarticulated or unofficial

15   agreement.

16        A.    Well, I mean, you know, Frank and I have

17   been friends for 25 years.  So we talk a lot, but whether

18   you could say that there was an enforceable agreement from

19   those conversations, the answer would be no.

20        Q.    Are you Frank's lawyer?

21        A.    I have been, yeah, on different things.  He

22   has many lawyers that help him.

23        Q.    Do you represent him in connection with any

24   matters having to do with Chance & Anthem?

25        A.    Yes.

```
 1        Q.    What matters?

 2        A.    Well, no, I represented him in a mortgage

 3   foreclosure suit against the Mohammeds, which mortgage was

 4   once held by Chance & Anthem.

 5        Q.    Any other matters related to Chance & Anthem

 6   where you represented Mr. Zakitis?

 7        A.    Not that I recall.

 8        Q.    Are there any communications with

 9   Mr. Zakitis concerning the Mohammeds' mortgage?

10        A.    Oh, sure.  Every time something is filed, he

11   gets a copy of it.  Well, not every time.  There are a few

12   times that I forgot to send it to him but, yeah, he gets

13   all that stuff eventually.

14        Q.    Do you communicate with him by email?

15        A.    Sometimes.

16        Q.    From your, I think you said it was your MSN

17   account?

18        A.    Always, yeah.

19        Q.    Do you use any other email accounts?

20        A.    No.  Well, I do have a Gmail account, but I

21   don't use it.

22              MR. SUAREZ:  Okay.  I'm good.

23              MR. FURR:  Any other creditors have

24   questions?

25              If anybody is here representing a creditor
```

1   I'd like to know who they are.  So announce their

2   representation on the record.

3                    MR. SWIFT:  Your Honor, Trent Swift on

4   behalf of Richard Neff.

5                    MR. FURR:  Do you have any questions,

6   Mr. Swift?

7                        EXAMINATION

8   BY MR. SWIFT:

9        Q.    Mr. Siskind, you said that there was no

10  official agreement, and that there is no articulated

11  agreement.  Do you have plans at some point to articulate

12  an agreement or make an official agreement with the

13  Mr. Zakitis concerning the investment property?

14       A.    Yes.

15       Q.    And what is that intention?

16       A.    Well, I've got to wait until this permit

17  issue fiasco is over before I think I should approach

18  Frank on something like that.  The property has been

19  sitting for many months, I don't know exactly how long,

20  but there is a little bit of friction due to that at this

21  point, which I hope will be resolved by the issuance of

22  the permit.

23       Q.    Is that friction between you and

24  Mr. Zakitis?

25       A.    Correct.

1      Q.    When that friction is resolved, what are

2 your terms that you would intend to seek from Mr. Zakitis?

3      A.    I can't qualify what those terms would be,

4 but obviously I'm going to be hoping for the best

5 treatment of my creditors if we're involved in that

6 project, as well as the Maryland project.

7      Q.    Is Cannamed a Maryland corporation?

8      A.    Yes, and I think it may be an LLC.

9      Q.    And that LLC would have been organized in

10 the State of Maryland?

11     A.    Yes.

12     Q.    Does it have any involvement in the State of

13 Florida?

14     A.    No.

15     Q.    Has it ever done business in the State of

16 Florida?

17     A.    Well, it had its business offices here.

18     Q.    And where were those business office?

19     A.    At 525 South Flagler, fifth floor.

20     Q.    How long did they have those business

21 offices there?

22     A.    From their inception.

23     Q.    Which was when?

24     A.    I don't recall, you'd have to look at the

25 date of the filing of the LLC.

Page 33

```
 1          Q.    And the spelling of Cannamed, is that
 2    C-a-n-a-m-e-d, or two Ns?
 3          A.    Two Ns.
 4          Q.    So C-a-n-n-a-m-e-d?
 5          A.    Correct.
 6          Q.    And that's a Maryland LLC, to the best of
 7    your recollection?
 8          A.    I know it is.
 9          Q.    You know it is, okay.
10                MR. SWIFT:  No further questions.
11                MR. FURR:  Thank you.
12                Anyone else have any questions?
13                MR. ARESTY:  Max Aresty on behalf of Fred
14    Volkwein.
15                MR. FURR:  Like your father.
16                MR. ARESTY:  I apologize, but I'm not used
17    to these meetings --
18                MR. FURR:  Sure.
19                MR. ARESTY:  -- and I'm not really on top of
20    the case.  I was attending on behalf of my father.
21                          EXAMINATION
22    BY MR. ARESTY:
23          Q.    But regarding this Zakitis house, the
24    project house ---
25                MR. FURR:  Could you move over closer to the
```

1    table?

2              MR. ARESTY:  Yeah, yeah.

3              THE WITNESS:  Or you can come to the table.

4    Right, it's your table, but I presume he can sit here.

5              MR. FURR:  You can sit there.

6    BY MR. ARESTY:

7         Q.    Regarding the Zakitis house, is there a

8    reason why Frank Zakitis would enter into any kind of

9    agreement with you?  Does he owe you something?

10        A.    No, he owes me nothing, but he is a

11   businessman, on one hand, and he's got a big heart on the

12   other, and when the Maryland license wasn't issued to

13   Cannamed, I asked him if he could help me with some of

14   these projects.  So he ended up purchasing the loan that

15   New Wave had on the project house, and then eventually

16   foreclosed on it.  Actually it was in foreclosure.  So he

17   bought the foreclosure suit.

18        Q.    And he completed the foreclosure?

19        A.    Correct, and then bought it in a

20   foreclosure.

21        Q.    Did he go above his judgment amount to win

22   the bid?

23        A.    I don't recall.  I think he paid $1,100,000.

24   No, it was -- no, I can tell you the answer actually I

25   have it with me.  No, he's eligible to collect

1  approximately a $65,000 deficiency.

2       Q.  What was the amount of the judgment?

3       A.  Well, you can calculate it from what I think

4  he bought it for.  Well, rather than do that, obviously

5  you can check in public record.  I don't know.

6       Q.  You don't recall?

7       A.  Not really.

8       Q.  So if he was to strike a deal with you to

9  help assist your creditors after you get over this sticky

10  situation, would that be purely gratuitous?

11       A.  I would have to say yes.

12       Q.  The monies that were owed to Fred Volkwein

13  that you put in your schedule, can you tell me how you

14  came to that number?

15       A.  That was a number that I calculated and

16  published to Fred, it might have been as much two years

17  ago, I'm not sure.

18       Q.  So is it consistent with the ledger that

19  you're referring to?

20       A.  Yes.

21       Q.  And do you have any copies of that ledger?

22       A.  I don't know if I still do, but I'm sure

23  Fred has them.

24       Q.  And how were they sent to Fred?

25       A.  Handed to Fred at a meeting in my office.

```
 1              Q.    Where they given to him in any other way?
 2              A.    Not that I recall, no.
 3              Q.    And did you keep any records, physical or --
 4    this ledger, would you have physical copies, or would you
 5    have digital copies?
 6              A.    I had a physical copy.  It was handwritten,
 7    and it was kept in a file with his name on it.
 8              Q.    Okay.  So a physical copy only?
 9              A.    I believe so, yeah.
10              Q.    And these were the records that you -- they
11    were removed from your office?
12              A.    Correct.
13              Q.    And this gentleman ---
14              A.    I believe were removed from my office.
15              Q.    And Mr. Gibson, you believe, is the one who
16    -- if they were removed, he's the one who removed them?
17              A.    Yes, I believe that because when I sent in
18    the van for them, by email, to an address that I know
19    belongs to him, I never received a response.
20              Q.    Okay.  So Mr. Gibson is unresponsive, and
21    his whereabouts are unknown at this time?
22              A.    Oh his whereabouts are perfectly known, he's
23    sitting right here.
24              Q.    Oh, okay, but he's been unresponsive?
25              A.    Correct.
```

1    Q.    Okay, and you said you were making some

2    amendments to your schedules, is that correct?

3    A.    I'm going to, yes.

4    Q.    And is ---

5    A.    Well, when you say your schedules, you mean

6    Chance & Anthem's schedules?

7    Q.    Chance & Anthem, yes.

8    A.    Yes.

9    Q.    Are you going to be amending any of the

10   entries relating to Mr. Volkwein?

11   A.    I hadn't intended to, no, but I guess if

12   Fred sits with me either individually or through your

13   firm, and can show me where my numbers are wrong, I would

14   amend based on his numbers if I thought they were correct.

15   MR. SWIFT:  Okay.  Thank you.

16   Mr. FURR:  Thank you.

17   Anybody else have any questions?

18   Yes, ma'am.

19   MS. WILLIAMS:  I'm Sophie Williams on behalf

20   of (inaudible) and Carl Stone.

21   MR. FURR:  (Inaudible.)

22                    EXAMINATION

23   BY MS. WILLIAMS:

24   Q.    Mr. Siskind, regarding your schedules for

25   Chance & Anthem, what materials did you use to prepare

```
 1    them without your records?
 2            A.    I don't remember.
 3            Q.    Did you go by memory?
 4            A.    In part, yes.
 5            Q.    Did you use any bank records?
 6            A.    I don't recall what I used.
 7            Q.    Would you use any handwritten records?
 8            A.    I don't recall.  I said that three times
 9    now.
10            Q.    Okay.  I'm trying to specify, hoping maybe
11    it will trigger your memory.
12                  Okay.  So with respect to the $300,000 that
13    you mentioned for the lease to own on the property in
14    Maryland, where -- what was the origination of that
15    $300,000?
16            A.    I don't recall.
17            Q.    Would it have come from Mr. Stone?
18            A.    No.
19            Q.    Mr. Fiore?
20            A.    No.
21            Q.    Would it have come from either Diana or
22    Christopher George?
23            A.    No.  Diana George is not a creditor.  She
24    has no basis for being a creditor.
25                  Christopher George loaned $2 million to
```

```
 1   Sovereign Gaming (phonetic), which then assisted with the

 2   funding of Cannamed, but they had no direct privity with

 3   Cannamed.

 4        Q.    How much of the money was used for Cannamed

 5   funding?

 6        A.    I have no idea.

 7        Q.    And you said that was through Sovereign

 8   Gaming?

 9        A.    Right, there are two promissory notes, as

10   you well know, totalling $2 million, which

11   Christopher George (inaudible) loaning that money to

12   Sovereign Gaming.

13        Q.    I have seen purported copies of the

14   purported promissory notes.

15        A.    And you've also seen the release that

16   David Fiore signed.

17        Q.    I have seen the purported release, yes.

18        A.    And the affidavit which Carl Stone provided?

19        Q.    I am familiar with Mr. Stone's affidavit, if

20   we're talking about the same one.  I don't know if there

21   is another one I don't know about.

22        A.    So you really don't represent any valid

23   creditors in this bankruptcy, do you?

24             MR. FURR:  Mr. Siskind ---

25   BY MS. WILLIAMS:
```

```
1            Q.    Did you ---
2                  MR. FURR:  -- she gets to ask the questions.
3    You don't.
4                  THE WITNESS:  I just made the statement for
5    the record then.
6                  MS. WILLIAMS:  All right.
7                  THE WITNESS:  But, Mr. Trustee, I will also
8    state that I brought a listing of the valid creditors and
9    she's not one, her clients aren't one it.
10                 MR. FURR:  All right.
11                 MS. WILLIAMS:  I don't ---
12                 THE WITNESS:  Mr. Neff is on it and
13   Mr. Volkwein is on it also.
14                 MS. WILLIAMS:  I will say for the record
15   that my clients have been noticed with regard to the
16   Chance & Anthem bankruptcy matters, and that is why I'm
17   here.  So whether or not Chance & Anthem claims them to be
18   valid creditors I think is another issue.
19                 MR. FURR:  That is another issue, and I
20   don't make that decision.
21                 MS. WILLIAMS:  All right.  I don't have
22   any ---
23                 MR. FURR:  There is a guy with a black robe
24   that does that.
25                 MS. WILLIAMS:  I don't have any other
```

1    questions.  Thank you.

2                     THE WITNESS:  Did you say guy or gal?

3                     MR. FURR:  Guy.  Why, who is this one?

4                     THE WITNESS:  It's a gal.

5                     MR. FURR:  A gal.

6                     Anybody else have any questions?

7                     If all the lawyers would just give their

8    card to Mr. Suarez, if you don't mind, so we can get in

9    touch with you, we'll be glad to do that and share any

10   information with you if you want to.

11                    All right.  This meeting is concluded.

12   Thank you very much.

13

14

15                    (Thereupon, the 341 Meeting of Creditors was

16   concluded.)

17

18

19

20

21

22

23

24

25

Page 42

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA          :

5    COUNTY OF MIAMI-DADE       :

6

7                 I, Cheryl L. Jenkins, RPR, RMR, Shorthand

8    Reporter and Notary Public in and for the State of Florida

9    at Large, do hereby certify that the foregoing Section 341

10   Meeting of Creditors was transcribed by me from a digital

11   recording made on the date and at the place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record to the best

14   of my ability of said proceedings.

15                 WITNESS my hand this 25th day of July, 2018.

16

17

18            _____

19                 CHERYL L. JENKINS, RPR, RMR

20                 Court Reporter and Notary Public
                in and for the State of Florida at Large
21                    Commission #GG 138863
                       December 27, 2021
22

23

24

25

# EXHIBIT "B"

## Suarez, Jesus

**From:** Jeffrey Siskind <jeffsiskind@msn.com>
**Sent:** Wednesday, August 22, 2018 1:56 PM
**To:** Suarez, Jesus
**Subject:** RE: Chance & Anthem

I sent Sofiye Williams the Fiore/Stone Ledger. The $2,000,000 loaned to Sovereign Gaming & Entertainment, LLC (SGE) by Christopher George was on a ledger for SGE, and is privileged. The $725,000 claimed by Richard Neff was deposited to the Chance & Anthem account at Chase; not my trust account. I am willing to enter into a personally resolve the Volkwein claim because of his involvement in CannaMED. I am therefore at a loss as to what information you need which requires an inquiry into the privileged information contained in my trust account.

Jeffrey M. Siskind, Esquire
S I S K I N D   L E G A L
3465 Santa Barbara Drive
Wellington, FL  33414
TEL  561-791-9565
FAX  561-791-9581
CELL 561-352-9166
jeffsiskind@msn.com
jeffsiskind@gmail.com

---

**From:** Suarez, Jesus <jsuarez@gjb-law.com>
**Sent:** Wednesday, August 22, 2018 11:45 AM
**To:** 'Jeffrey Siskind' <jeffsiskind@msn.com>
**Cc:** rfurr@furrcohen.com
**Subject:** RE: Chance & Anthem

Mr. Siskind,

We have subpoenaed your trust account records based on your testimony that you do not possess contemporaneous records. Additionally, you have advised us that as a result you do not have the ability to generate ledgers isolating transactions with particular parties. As a result, we need to examine all of your trust account records in order to be able to do so ourselves.

If you wish to propose another manner for us to complete this analysis, we are happy to review and discuss your proposal. In the alternative, we are amenable to discussing they entry of an appropriate confidentiality order with respect to your trust records only. Please let us know how you wish to proceed. Thank you.

Jesus

Jesus M. Suarez
Genovese Joblove & Battista, P.A.
Direct 305.913.6682
jsuarez@gjb-law.com

---

**From:** Jeffrey Siskind [mailto:jeffsiskind@msn.com]
**Sent:** Tuesday, August 14, 2018 8:40 PM
**To:** Suarez, Jesus
**Subject:** Chance & Anthem

This shall serve as an invitation to confer on the substance of my motion docketed as DE 121 pursuant to the requirements of Local Rule 9073-1(D).  Please let me know if you wish to discuss.

Jeffrey M. Siskind, Esquire
S I S K I N D   L E G A L
3465 Santa Barbara Drive
Wellington, FL  33414
TEL  561-791-9565
FAX  561-791-9581
CELL 561-352-9166
jeffsiskind@msn.com
jeffsiskind@gmail.com

EXHIBIT C

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA


IN RE:                    CASE NO. 18-16248-MAM

 CHANCE & ANTHEM, LLC

            Debtor.
_____/


341 MEETING OF CREDITORS

July 9, 2018

        The above-entitled cause came on for a Section
341 Meeting of Creditors before ROBERT FURR, one of the
trustees in the UNITED STATES BANKRUPTCY COURT, in and for
the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler
Dr., West Palm Beach, Palm Beach County, Florida on July
9, 2018, commencing at or about 8:30 a.m., and the
following proceedings were had.




        Transcribed from a digital recording by:
            Cheryl L. Jenkins, RPR, RMR

1
2                          APPEARANCES:
3
                         ROBERT FURR, Trustee
4
5              GENOVESE JOBLOVE & BATTISTA, by
                      JESUS M. SUAREZ, Esquire
6                     On behalf of the Trustee
7
                      TRENT SWIFT, Esquire
8                     On behalf of Richard Niff
9
                      MAX ARESTY, Esquire
10             On behalf of Frederick Volkwein
11
                      SOFIYE WILLIAMS, Esquire
12                    On behalf of Carl Stone
13                    - - - - - - - -
14
15              WITNESS
Jeffrey Siskind                        Page
16   Examination by Mr. Furr             3
     Examination by Mr. Suarez          11
17   Examination by Mr. Swift           31
     Examination by Mr. Aresty          33
18   Examination by Mr. Williams        37
19
20
21
22
23
24
25

```
 1                  MR. FURR:  Trustee calls Case
 2  Number 18-16248, Chance & Anthem, LLC.
 3                  MR. SISKIND:  Do you want me on this side,
 4  Robert?
 5                  MR. FURR:  Right there is fine.
 6                  Please raise your right hand.
 7                  Do you swear to tell the truth, the whole
 8  truth and nothing but the truth?
 9                  MR. SISKIND:  I do.
10  Thereupon,
11                  JEFFREY SISKIND,
12  having been first duly sworn, was examined and testified
13  as follows:
14                  MR. FURR:  For the record I've verified
15  Mr. Siskind's address, and identity and will return it
16  back to him, and I also know him.
17                  EXAMINATION
18  BY MR. FURR:
19          Q.    Please state your name.
20          A.    Jeffrey Mark Siskind.
21          Q.    Mr. Siskind, what's your position with
22  Chance & Anthem?
23          A.    I was the managing member.
24          Q.    Did you file this bankruptcy up in Baltimore
25  originally?
```

1       A.    In Maryland, yes.

2       Q.    In Maryland.  Are you still the managing

3  member?

4       A.    Well, that's a legal question.  I guess you

5  could answer it better than I can.  I was the last

6  managing member.

7       Q.    Okay.  No one -- you didn't resign?

8       A.    No, I did not.

9       Q.    In Baltimore you filed the petition, and

10  when you signed the petition, did you sign it?

11       A.    Yes.

12       Q.    As the managing member?

13       A.    Either as that or counsel to the ---

14       Q.    Okay.  I just see your signature on there on

15  February the 12th, 2018.  That's your signature?

16       A.    Well, the petition had my signature.

17       Q.    Let me just show you, make sure you

18  understand.

19       A.    Yes.

20       Q.    The one right there.  Okay, and the

21  information in the original petition, summary of assets,

22  schedules of assets, were those true and correct?

23       A.    To the best of my knowledge at the time,

24  yes.

25       Q.    Do you wish to make any amendments to those

1    schedules?

2         A.    We're going to make amendments, yes.

3         Q.    Okay, and you say "we", does that mean

4    somebody else with you?

5         A.    The company "we".  I should say I.

6         Q.    Right.  Can you tell me when Chance & Anthem

7    was formed?

8         A.    No, I don't remember when it was formed, but

9    it's on the SunBiz site.

10        Q.    Okay, and did you form it?

11        A.    Yes.

12        Q.    So what in these schedules is inaccurate

13   that you listed on the original schedules, petition and

14   statement of financial affairs, or are you going add more

15   information to it?

16        A.    We're going to add information, but I

17   remember that there was a date that was incorrect as to

18   when we vacated a property in Maryland that the company

19   was utilizing.

20        Q.    All right.  Has Chance & Anthem ever filed

21   tax returns?

22        A.    No, it never made any money.

23        Q.    I didn't ask that.  I said, did it ever file

24   tax returns --

25        A.    No.

1      Q.     -- and you should know.

2             Okay.   There was a tax return -- there was a

3      significant claim filed, one claim filed in the case so

4      far by Del Marva Power in Carney's Point, New Jersey.  It

5      looks like a power company.

6      A.     Correct.

7      Q.     And this is an electric bill for property at

8      27120 Ocean Gateway, or Gtwy, in Hebron, Maryland.  Can

9      you tell me, are you familiar with that address?

10     A.     Certainly.

11     Q.     And what is that, what building or property

12     is located there?

13     A.     There is a 47,000-square foot building,

14     approximately, located on just under seven acres, which

15     the company had a lease purchase agreement --

16     Q.     Okay.

17     A.     -- on.

18     Q.     And who are they lease purchasing it from?

19     A.     27120 Ocean Gateway, LLC.

20     Q.     Who owns that company, that was Ocean

21     Gateway company you just mentioned?

22     A.     That company is owned by a fellow by the

23     name of Alan Bias.

24     Q.     How do you spell Mr. Bias' last name?

25     A.     B-i-a-s.

1       Q.      And who is Mr. Bias, do you know him?

2       A.      Yes.

3       Q.      Business associate of yours?

4       A.      No, except for that deal.

5       Q.      Okay.  A total third party?

6       A.      Yes, arm's length third party.

7       Q.      And then was there actually a written lease

8  for that?

9       A.      There was a lease option agreement, yes.

10      Q.      And do you have a copy of that lease option

11 agreement?

12      A.      I don't know if I still have a copy, but I'm

13 sure that Mr. Bias would be more than willing to give it

14 to you.

15      Q.      And can you tell me the terms of the lease

16 option agreement?

17      A.      I think it was monthly payments of about

18 7,361, if my memory serves me correctly, and then there

19 was an option for a buyout at, I think it was 700,000.  It

20 might have been 750,000.

21      Q.      And did you pay a down payment on that lease

22 option when you signed it?  I assume you signed it on

23 behalf of Chance & Anthem?

24      A.      Yes.

25      Q.      So when you signed it, did you put down

1    $100,000, 50,000, or some amount of money as a deposit?

2         A.    I think we put down $300,000 when the

3    building was purchased.

4         Q.    Okay.  So was the building actually in the

5    name of Chance & Anthem?

6         A.    Never.

7         Q.    So it wasn't purchased?

8         A.    The building was purchased by 27120 Ocean

9    Gateway, LLC from a company, a gas company up there that

10   owned it.

11        Q.    Okay, and so ---

12        A.    Wait a minute.  If my memory serves me

13   correctly, that's the way it was structured.

14        Q.    Okay, and so you put the $300,000 down, you

15   being Chance & Anthem?

16        A.    Well, I believe Chance & Anthem put that

17   money down.

18        Q.    Okay, and so the building was not purchased

19   in Chance & Anthem's name?

20        A.    No.

21        Q.    The name of the other company?

22        A.    Correct.  Well, let me think about that.  I

23   guess it would have to have been yeah.  Yes, yes.

24        Q.    Okay, and who is occupying that building

25   today?

```
 1          A.    I have no idea.

 2          Q.    When was the last time you were there?

 3          A.    I don't remember, whenever I thought that we

 4   vacated it, I guess, is the last time.

 5          Q.    At the height of your occupancy, or Chance &

 6   Anthem's occupancy of the building, if I went there, would

 7   I find a staff of people working there?

 8          A.    Yes.

 9          Q.    Would I find the marijuana growing

10   operation?

11          A.    It would have been.  It was not.  There were

12   no plants on site.

13          Q.    But that's what you were going to do in the

14   building, was grow marijuana in it?

15          A.    Correct.

16          Q.    But you never did?

17          A.    Correct.

18          Q.    So what did you actually do there other than

19   just open up an office?

20          A.    We were renovating the building.

21          Q.    Okay.  How much did you spend on the

22   renovation?

23          A.    I don't remember.

24          Q.    Would it be Chance & Anthem that spent the

25   money?
```

```
 1            A.    I believe so.

 2            Q.    Would Chance & Anthem's bank records, the

 3    bank checkbook show the payments for the renovation?

 4            A.    It should.  It might not show all of them,

 5    but there were payments to individuals who were working on

 6    the site, subcontractors, you should see those, yeah.

 7            Q.    And those -- was there a separate checking

 8    account in Maryland for that purpose?

 9            A.    No.

10            Q.    Just the checking account for the company

11    here that you've already provided us?

12            A.    Yeah, there were no other accounts in other

13    -- out of state.

14            Q.    Are there any other unpaid utility bills

15    such as this?

16            A.    Utility bills?

17            Q.    Yes.

18            A.    Well, let's see, there is a little over $800

19    due a trash disposal company.

20            Q.    Right.

21            A.    And are you asking that question regarding

22    that specific property only?

23            Q.    No, anything.

24            A.    Anything, okay.  There is a pool service

25    company that's owed money, $600.
```

1        Q.    Pool service?

2        A.    Uh-huh.

3        Q.    Did the company have a swimming pool?

4        A.    No, the project that we had in Florida,

5 which was the renovation of a house, has a pool.

6        Q.    Okay.   Did Chance & Anthem own a house in

7 Florida in was renovating?

8        A.    Yes.

9        Q.    Did it actually have a house in its name?

10       A.    I believe so.

11       MR. FURR:   I've got an attorney here,

12 Mr. Suarez, who is going to ask you a few questions.   I'm

13 going to turn it over to him, and then there may be some

14 creditors here.   You're also welcome to ask questions if

15 you are a creditor.

16                  EXAMINATION

17 BY MR. SUAREZ:

18       Q.    So, Mr. Siskind, good morning.   We've met

19 before.   My name is Jesus Suarez.   My firm is proposed

20 counsel to the Chapter 7 trustee.

21         Does Chance & Anthem have any books and

22 records?

23       A.    There were books and records which were

24 removed from my office at one point in time, yes.

25       Q.    Where were they moved to?

Page 12

1          A.     I don't know.

2          Q.     Who removed them?

3          A.     Robert Gibson.

4          Q.     All right, and why did Mr. Gibson remove

5    them?

6          A.     He took all my files.  He was supposed to

7    only take the dead files, but when I went into the

8    cabinet, which I thought contained my live files, it was

9    empty.

10          Q.     All right, and did you ever use a computer

11    to transact business for Chance & Anthem or send emails on

12    behalf of ---

13          A.     Correspondence, emails, yes.

14          Q.     From what email address?

15          A.     Just from my personal address.

16          Q.     What email address is that?

17          A.     JeffSiskind@msn.com.

18          Q.     Did you use any other electronic form of

19    communication on behalf of Chance & Anthem?

20          A.     No.

21          Q.     In the debtor's schedules you listed a

22    computer, a printer and a monitor belonging to Chance &

23    Anthem with an estimated value of $150.

24          A.     Correct.

25          Q.     Where is that right now?

```
 1              A.      The last I saw it it was in the facility in
 2      Maryland.
 3              Q.      What facility in Maryland is that?
 4              A.      The building that we were talking about,
 5      which is located at 27120 Ocean Gateway.
 6              Q.      And was that facility vacated before April
 7      of 2018?
 8              A.      Yes.
 9              Q.      All right.  So the last time you saw those
10      books and records was before April of 2018?
11              A.      No, that's the last time I saw the computer.
12      I don't remember when the last time I saw the books and
13      records was.
14              Q.      I'm sorry, the computer.
15              A.      Yes.
16              Q.      Where is that computer right now?
17              A.      I have no idea.
18              Q.      You left it in the warehouse in Maryland?
19              A.      As I stated, the last time I saw it it was
20      in the warehouse in Maryland.
21              Q.      All right, and you turned over the warehouse
22      in Maryland to Ocean Gateway, is that correct?
23              A.      Yes.
24              Q.      All right, and at that time ---
25              A.      When you say Ocean Gateway, you mean the
```

1   LLC, 27120 Ocean Gateway, LLC?

2          Q.    Owned by Mr. Bias.

3          A.    I believe it's owned by Mr. Bias.  It's, I

4   believe, a Fla -- well, it might be a Maryland limited

5   liability company, but they have the same sort of on-line

6   service that you can check to get whatever information you

7   need about it.

8          Q.    Do you have any interest in that entity?

9          A.    No.

10              MR. FURR:  Do you have a phone number for

11  Mr. Bias?

12              THE WITNESS:  No.  I do, I can get it for

13  you.

14              MR. FURR:  Would you please get that for

15  me --

16              THE WITNESS:  Sure.

17              MR. FURR:  -- so I can contact him.

18  BY MR. SUAREZ:

19          Q.    On October 12th, 2017, Chance & Anthem

20  transferred and assigned a promissory note and mortgage

21  encumbering property in Cross Creek, owned by Mr. and

22  Mrs. Emmet Tias (phonetic) and Zoreda Mohammed (phonetic).

23  Are you familiar with them?

24          A.    Sure.

25          Q.    All right.  How did the debtor come to own

1    that note and mortgage?

2         A.    The debtor bought that note and mortgage

3    from an individual lender named George Maylor (phonetic).

4         Q.    And how much did the debtor pay for that

5    note and mortgage?

6         A.    $27,250.

7         Q.    And where did that money come from?

8         A.    I don't recall.

9         Q.    Would it have been paid from the debtor's

10   bank account at JP Morgan?

11        A.    I think so.  I'm not totally positive, but

12   probably.

13        Q.    All right.  If it wasn't paid from the

14   debtor's bank account at J.P. Morgan, where would it have

15   been paid from?

16        A.    I don't know.  It might have been my law

17   office account.

18        Q.    All right, and when would it have been paid

19   from by your law office account?

20        A.    I have no idea why ---

21        Q.    Was your law office account holding monies

22   for Chance & Anthem?

23        A.    Not that I recall, but we represented George

24   Maylor, and of course we also represented Chance & Anthem,

25   which I owned a hundred percent of.

```
 1          Q.    When you say "we", who is "we"?

 2          A.    The company "we".  Forgive me, I always say

 3    that.  I.

 4          Q.    Who is the company "we"?

 5          A.    Siskind Legal.

 6          Q.    Is that an LLC?

 7          A.    Siskind Legal Services, LLC did exist at one

 8    time, but it's lapsed.

 9          Q.    All right.  So when you say that the

10    company, we, paid for Chance & Anthem's purchase of this

11    mortgage, that it came from the law firm, what law firm is

12    that?

13          A.    Well, it's my law firm, if it indeed came

14    from there.  I'd have to look.

15          Q.    Okay.  So it might have come from somewhere

16    else?

17          A.    It could have, but it's not hard to figure

18    out where it came from.  I'm sure I have a record of that

19    check.

20          Q.    And you represented Chance & Anthem in that

21    transaction?

22          A.    Correct.

23          Q.    What consideration did Chance & Anthem

24    receive for the sale of that note and mortgage, if any?

25          A.    The tot -- Frank Zakitis who bought that
```

```
 1    note and mortgage, is that what you mean?

 2            Q.    Yes.

 3            A.    Received, I believe, a total of $25,000.

 4            Q.    Who received $25,000?

 5            A.    I'm thinking that it went into the law firm,

 6    yeah.

 7            Q.    So when you sold Chance & Anthem's $25,000

 8    mortgage and promissory note, Frank Zakitis paid your law

 9    firm $25,000?

10            A.    Well, I'm certain that he paid the 25 --

11    well, not a hundred percent certain of the amount, but

12    approximately $25,000, and I believe they all went through

13    a transfer account into my law firm.

14            Q.    Okay.

15            MR. FURR:  What's a "transfer account"?

16            THE WITNESS:  It's just an account that was

17    set up to handle transactions between the law firm and

18    Frank Zakitis.

19            MR. FURR:  And is that a separate account?

20            THE WITNESS:  Yeah.

21            MR. FURR:  And where is that account

22    located?

23            THE WITNESS:  PNC Bank.

24            MR. FURR:  What's the name of the account?

25            THE WITNESS:  Siskind Legal Services, LLC.
```

1          MR. FURR:  And it's only used to transfer

2     monies between your law firm and other parties?

3          THE WITNESS:  That's why it originally

4     existed.  Frank Zakitis is located in Pittsburgh, and when

5     he would pay bills, he would pay them at PNC.  He kept the

6     account at PNC down here.

7          MR. FURR:  And that PNC account, is that

8     still open?

9          THE WITNESS:  Yeah.

10         MR. FURR:  Sorry.

11    BY MR. SUAREZ:

12         Q.    On August 25th, 2015, the debtor bought real

13    estate at 3445 Santa Barbara Drive, is that correct?

14         A.    I'm not sure of the date, but that's the

15    project house that we were talking about.

16         Q.    All right, and what do you mean by the

17    "project house"?

18         A.    It's a house that was purchased from

19    J.P. Morgan Chase to renovate and sell.

20         Q.    And what was the source of funds used to

21    purchase that house?

22         A.    I don't remember exactly, but we paid

23    approximately $1,250,000 for it.

24         Q.    Where did that million two fifty come from?

25         A.    I don't remember.  Give me a moment.  I can

1  probably think.  Private lenders.

2          Q.    Who were those private lenders?

3          A.    I believe one member was Richard Niff, and

4  another one was Carl Stone and/or David Fiore.

5          Q.    Were monies from Richard Niff and

6  David Fiore deposited into Chance & Anthem's bank account

7  at J.P. Morgan?

8          A.    I don't believe so, no.

9          Q.    All right.  Where were those monies funded

10 from for that purchase?

11         A.    Oh, I think one was.  Yeah, I think

12 Mr. Neff's money did go through the Chance & Anthem

13 account.  Don't hold me to that, but I'm pretty sure

14 that's where that, and then Carl Stone's money was

15 deposited into my attorney trust account.

16         Q.    Were those investments in Chance & Anthem

17 documented?

18         A.    Sure.

19         Q.    How were they documented?

20         A.    I don't remember.

21         Q.    Did you represent Chance & Anthem in

22 documenting those transactions?

23         A.    Well, there was no one else to represent

24 Chance & Anthem, so I guess you could say that I did.

25         Q.    Did you represent Mr. Neff in documenting

1   those transactions?

2           A.    No.

3           Q.    Did you represent Mr. Stone or Mr. Fiore in

4   documenting those transactions?

5           A.    No.

6           Q.    Have you ever represented Mr. Stone or

7   Mr. Fiore?

8           A.    No, as to Stone.  Yes, as to Fiore.

9           Q.    All right.  Did you represent Mr. Fiore in

10  any matters related to Chance & Anthem?

11          A.    Not that I recall, no.

12          Q.    Chance & Anthem took a mortgage out from New

13  Wave Loans Residential, LLC in about November of 2015 --

14          A.    I don't recall --

15          Q.    -- is that correct?

16          A.    -- the date, but that was a mortgage that we

17  borrowed, yeah, against the project house.

18          Q.    When you say "we", who do you mean "we"?

19          A.    Chance & Anthem.

20          Q.    Okay, and where were those funds deposited?

21          A.    I don't remember.

22          Q.    Would they have been deposited at the

23  debtor's bank account at J.P. Morgan?

24          A.    I don't remember.

25          Q.    Is there anywhere else, besides the debtor's

```
 1    bank account, where they would have been deposited?

 2              A.    I don't remember where they were deposited.

 3              Q.    All right, and what were those funds used

 4    for?

 5              A.    They were used toward the Maryland marijuana

 6    growing project.

 7              Q.    What you say the marijuana growing project

 8    in Maryland, do you mean the marijuana project that

 9    Cannamed Pharmaceuticals was --

10              A.    Correct.

11              Q.    -- operating?

12                    In March ---

13              A.    Well, let's stop, not operating, but

14    developing.

15              Q.    Okay, developing.

16                    What was the difference between the debtor

17    and Cannamed Pharmaceuticals, what did the debtor do in

18    Maryland, and what did Cannamed Pharmaceuticals do?

19              A.    The debtor owns 70 percent of Cannamed

20    Pharmaceuticals.

21              Q.    Okay.  Is the debtor's ownership in Cannamed

22    Pharmaceuticals documented in any way?

23              A.    It was.

24              Q.    How?

25              A.    There is a certificate of, I don't know what
```

```
 1    you call it, because it's an LLC, a unit interest

 2    certificate.

 3            Q.    And where is that ---

 4            A.    With the files that are missing.

 5            Q.    Did you ever have those on a computer?

 6            A.    No.

 7            Q.    Did you ever email them to anybody?

 8            A.    No.  When you saw "them", you're talking

 9    about the certificates --

10            Q.    The certificates.

11            A.    -- in favor of ---

12            Q.    Sure.

13            A.    No.

14            Q.    Who owned the other 30 percent of Cannamed?

15            A.    I personally own 5 percent, still do.  An

16    individual by the name of Bruce Lowe owns 5 percent, and

17    the rest I don't recall.

18            Q.    On March 23rd of 2016 there was a mortgage

19    recorded in favor of EBK South Properties, LLC against the

20    Santa Barbara house --

21            A.    Correct.

22            Q.    -- for about a half a million dollars,

23    $500,000.

24            A.    No.  There was a line of credit, I think the

25    actual borrowing against that house was, if memory serves
```

1    me correctly, 160,000.

2            Q.    And where were those $160,000 deposited?

3            A.    I don't remember, but the funds were used

4    for Cannamed.

5            Q.    For Cannamed?

6            A.    On behalf of -- yeah, payment of Cannamed

7    expenses, to the best of my recollection.

8            Q.    Were the funds deposited in Chance &

9    Anthem's account at J.P. Morgan?

10           A.    I don't remember where those were deposited.

11           Q.    Why was Chance & Anthem funding Cannamed's

12   expenses?

13           A.    Because that was the agreement, Chance &

14   Anthem assisted -- Cannamed had no income, so Chance &

15   Anthem provided all the funding that Cannamed needed.

16           Q.    Why was Cannamed incapable of procuring that

17   funding for itself?

18           A.    It was more or less a shell company.

19           Q.    Did Chance & Anthem ever have any income?

20           A.    No.

21           Q.    Did Chance & Anthem have any business

22   operations?

23           A.    Other than what we've discussed, no.

24           Q.    Did Chance & Anthem ever sell anything?

25           A.    That one mortgage that we spoke about.

1         Q.    Did Chance & Anthem ever produce anything?

2         A.    What do you mean by produce?

3         Q.    Did it ever make anything?

4         A.    Actually make a tangible product, no.

5         Q.    Okay.  You said there was an agreement

6 between Chance & Anthem and Cannamed?

7         A.    Yes.

8         Q.    How was that agreement documented?

9         A.    There was a document which required Chance &

10 Anthem to fund Cannamed in exchange for its unit

11 interests.

12         Q.    And where can I find that document?

13         A.    With all the other documents that are taken

14 from my office by Mr. Gibson.

15         Q.    That document was never scanned?

16         A.    No.

17         Q.    Was never emailed to anybody?

18         A.    Not that I recall, no.

19         Q.    So it would only have ever existed in a hard

20 file?

21         A.    Yes, and it was a one-page piece of paper, I

22 remember looking at it.

23         Q.    Whose Fredrick Volkwein?

24         A.    He is a valid creditor of Chance & Anthem.

25 He's an individual who I've known for probably 30 years

1    here in West Palm Beach.

2          Q.    And how much money did Mr. Volkwein lend to

3    Chance & Anthem?

4          A.    Well, according to my records $500,000.

5          Q.    All right, and how was that loan documented?

6          A.    I don't remember.  I remember that I have a

7    -- or had a power of attorney from Mr. Volkwein.  Those

8    funds came from properties that he sold at some point,

9    which my firm handled the sale transaction of.

10          Q.    And where were the funds loaned by

11    Mr. Volkwein deposited?

12          A.    I don't recall.  I imagine they ran through

13    my trust account, since we did the closing.  Well, we

14    didn't do the closing, but we represented him in the

15    closing of the sale of properties he had in West Palm

16    Beach.

17          Q.    And you represented him in the loan that he

18    made to Chance & Anthem?

19          A.    No, I don't believe so.

20          Q.    Was he represented by anyone in connection

21    with the loan he made to Chance & Anthem?

22          A.    No.

23          Q.    What were the terms of the loan he made to

24    Chance & Anthem?

25          A.    I don't remember.

1    Q.    Who would know?

2    A.    I would know if I had the ability to look at

3    the file, but -- or Fred would know.

4    Q.    And what were Mr. Volkwein's $500,000 used

5    for?

6    A.    I don't recall.  At some point the history

7    of his interest, I provided him with paperwork on that,

8    but beyond that you'd have to ask him.

9    Q.    What paperwork did you provide him?

10   A.    Just a disbursement sheet as to where his

11   money was used.

12   Q.    How was that disbursement sheet generated?

13   A.    By hand by me.

14   Q.    And what documents would you have reviewed

15   to generate that disbursement sheet?

16   A.    It was more or less a ledger that I kept on

17   him that I would update from time to time.

18   Q.    What documents would you use to create that

19   ledger?

20   A.    Just my bank records at the time.

21   Q.    The bank records of Chance & Anthem?

22   A.    I don't remember whether I ever utilized

23   Chance & Anthem's records to facilitate that report, no.

24   Q.    Would those have been your trust account

25   records?

1          A.     Some would have been, yeah.

2          Q.     All right.  So other than your trust account

3     records and Chance & Anthem records, if at all, what other

4     records would you have reviewed to create that ledger?

5          A.     I don't remember what bank account records

6     were involved in the review, but the one-page report that

7     I gave was accurate.

8          Q.     Whatever happened to that ledger?

9          A.     It was with the books and records that were

10    in my files when we vacated the office at 525 South

11    Flagler.

12         Q.     Those are the ones that you've testified

13    Mr. Gibson took possession of?

14         A.     I believe he removed them, yes.

15         Q.     Have you filed a police report for the

16    missing files?

17         A.     No, I didn't think the police report would

18    be availing, because I did give him permission to take all

19    of the dead files, and the understanding was the live

20    files would come out to the project house in Santa

21    Barbara, and the dead files, rather than discard them, he

22    would remove and keep in his garage at his house.

23         Q.     What's the current status of the project

24    house?

25         A.     The project house is owned by a company

1    controlled by Frank Zakitis, and it has been sitting

2    because of permit issues, but I understand that the plans

3    were just approved, and the permit should be issued today

4    or later this week.

5           Q.    What's your current involvement with the

6    project house?

7           A.    I don't have any official involvement with

8    that house.  It's located next to my house, so I do keep

9    an eye on it.

10          Q.    What's your unofficial involvement with the

11   house?

12          A.    Just keep an eye on it.

13          Q.    Do you have any interest in the house?

14          A.    No.

15          Q.    Do you have any agreement with Mr. Zakitis

16   concerning the disposition of that house?

17          A.    Nothing in writing.

18          Q.    Do you have any agreement that's not in

19   writing concerning the disposition of that house?

20          A.    Well, nothing that's enforceable since it

21   pertains to real estate, and would be barred by the

22   statute of frauds if it wasn't in writing.

23          Q.    That's not the question I'm asking.  I'm

24   asking what the agreement is.

25          A.    There is no official agreement.  I hope that

1    Frank will make some money on the house when he sells it,

2    and that he will do something for my creditors.

3            Q.    Okay.  Well, considering that Mr. Furr is

4    the trustee of those creditors, we'd like to know what the

5    unofficial agreement is, or what understanding you might

6    have, or what your expectation might be of what

7    Mr. Zakitis will do once he sells the house.

8            A.    I don't have any expectation.  There is no

9    articulated agreement at this point.

10           Q.    Is there an unarticulated agreement?

11           A.    No.

12           Q.    Okay.  Well, you've defined it as an

13   articulated agreement.  I was simply trying to define

14   whether there was an unarticulated or unofficial

15   agreement.

16           A.    Well, I mean, you know, Frank and I have

17   been friends for 25 years.  So we talk a lot, but whether

18   you could say that there was an enforceable agreement from

19   those conversations, the answer would be no.

20           Q.    Are you Frank's lawyer?

21           A.    I have been, yeah, on different things.  He

22   has many lawyers that help him.

23           Q.    Do you represent him in connection with any

24   matters having to do with Chance & Anthem?

25           A.    Yes.

1       Q.    What matters?

2       A.    Well, no, I represented him in a mortgage

3  foreclosure suit against the Mohammeds, which mortgage was

4  once held by Chance & Anthem.

5       Q.    Any other matters related to Chance & Anthem

6  where you represented Mr. Zakitis?

7       A.    Not that I recall.

8       Q.    Are there any communications with

9  Mr. Zakitis concerning the Mohammeds' mortgage?

10      A.    Oh, sure.  Every time something is filed, he

11  gets a copy of it.  Well, not every time.  There are a few

12  times that I forgot to send it to him but, yeah, he gets

13  all that stuff eventually.

14      Q.    Do you communicate with him by email?

15      A.    Sometimes.

16      Q.    From your, I think you said it was your MSN

17  account?

18      A.    Always, yeah.

19      Q.    Do you use any other email accounts?

20      A.    No.  Well, I do have a Gmail account, but I

21  don't use it.

22           MR. SUAREZ:  Okay.  I'm good.

23           MR. FURR:  Any other creditors have

24  questions?

25           If anybody is here representing a creditor

Page 31

1 | I'd like to know who they are.  So announce their

2 | representation on the record.

3 | MR. SWIFT:  Your Honor, Trent Swift on

4 | behalf of Richard Neff.

5 | MR. FURR:  Do you have any questions,

6 | Mr. Swift?

7 | EXAMINATION

8 | BY MR. SWIFT:

9 | Q.    Mr. Siskind, you said that there was no

10 | official agreement, and that there is no articulated

11 | agreement.  Do you have plans at some point to articulate

12 | an agreement or make an official agreement with the

13 | Mr. Zakitis concerning the investment property?

14 | A.    Yes.

15 | Q.    And what is that intention?

16 | A.    Well, I've got to wait until this permit

17 | issue fiasco is over before I think I should approach

18 | Frank on something like that.  The property has been

19 | sitting for many months, I don't know exactly how long,

20 | but there is a little bit of friction due to that at this

21 | point, which I hope will be resolved by the issuance of

22 | the permit.

23 | Q.    Is that friction between you and

24 | Mr. Zakitis?

25 | A.    Correct.

```
 1          Q.    When that friction is resolved, what are
 2   your terms that you would intend to seek from Mr. Zakitis?
 3          A.    I can't qualify what those terms would be,
 4   but obviously I'm going to be hoping for the best
 5   treatment of my creditors if we're involved in that
 6   project, as well as the Maryland project.
 7          Q.    Is Cannamed a Maryland corporation?
 8          A.    Yes, and I think it may be an LLC.
 9          Q.    And that LLC would have been organized in
10   the State of Maryland?
11          A.    Yes.
12          Q.    Does it have any involvement in the State of
13   Florida?
14          A.    No.
15          Q.    Has it ever done business in the State of
16   Florida?
17          A.    Well, it had its business offices here.
18          Q.    And where were those business office?
19          A.    At 525 South Flagler, fifth floor.
20          Q.    How long did they have those business
21   offices there?
22          A.    From their inception.
23          Q.    Which was when?
24          A.    I don't recall, you'd have to look at the
25   date of the filing of the LLC.
```

1          Q.    And the spelling of Cannamed, is that

2   C-a-n-a-m-e-d, or two Ns?

3          A.    Two Ns.

4          Q.    So C-a-n-n-a-m-e-d?

5          A.    Correct.

6          Q.    And that's a Maryland LLC, to the best of

7   your recollection?

8          A.    I know it is.

9          Q.    You know it is, okay.

10              MR. SWIFT:  No further questions.

11              MR. FURR:  Thank you.

12              Anyone else have any questions?

13              MR. ARESTY:  Max Aresty on behalf of Fred

14  Volkwein.

15              MR. FURR:  Like your father.

16              MR. ARESTY:  I apologize, but I'm not used

17  to these meetings --

18              MR. FURR:  Sure.

19              MR. ARESTY:  -- and I'm not really on top of

20  the case.  I was attending on behalf of my father.

21                        EXAMINATION

22  BY MR. ARESTY:

23          Q.    But regarding this Zakitis house, the

24  project house ---

25              MR. FURR:  Could you move over closer to the

Page 34

1   table?

2               MR. ARESTY:  Yeah, yeah.

3               THE WITNESS:  Or you can come to the table.

4   Right, it's your table, but I presume he can sit here.

5               MR. FURR:  You can sit there.

6   BY MR. ARESTY:

7        Q.    Regarding the Zakitis house, is there a

8   reason why Frank Zakitis would enter into any kind of

9   agreement with you?  Does he owe you something?

10       A.    No, he owes me nothing, but he is a

11  businessman, on one hand, and he's got a big heart on the

12  other, and when the Maryland license wasn't issued to

13  Cannamed, I asked him if he could help me with some of

14  these projects.  So he ended up purchasing the loan that

15  New Wave had on the project house, and then eventually

16  foreclosed on it.  Actually it was in foreclosure.  So he

17  bought the foreclosure suit.

18       Q.    And he completed the foreclosure?

19       A.    Correct, and then bought it in a

20  foreclosure.

21       Q.    Did he go above his judgment amount to win

22  the bid?

23       A.    I don't recall.  I think he paid $1,100,000.

24  No, it was -- no, I can tell you the answer actually I

25  have it with me.  No, he's eligible to collect

Page 35

1    approximately a $65,000 deficiency.

2           Q.    What was the amount of the judgment?

3           A.    Well, you can calculate it from what I think

4    he bought it for.  Well, rather than do that, obviously

5    you can check in public record.  I don't know.

6           Q.    You don't recall?

7           A.    Not really.

8           Q.    So if he was to strike a deal with you to

9    help assist your creditors after you get over this sticky

10   situation, would that be purely gratuitous?

11          A.    I would have to say yes.

12          Q.    The monies that were owed to Fred Volkwein

13   that you put in your schedule, can you tell me how you

14   came to that number?

15          A.    That was a number that I calculated and

16   published to Fred, it might have been as much two years

17   ago, I'm not sure.

18          Q.    So is it consistent with the ledger that

19   you're referring to?

20          A.    Yes.

21          Q.    And do you have any copies of that ledger?

22          A.    I don't know if I still do, but I'm sure

23   Fred has them.

24          Q.    And how were they sent to Fred?

25          A.    Handed to Fred at a meeting in my office.

1          Q.    Where they given to him in any other way?

2          A.    Not that I recall, no.

3          Q.    And did you keep any records, physical or --

4    this ledger, would you have physical copies, or would you

5    have digital copies?

6          A.    I had a physical copy.  It was handwritten,

7    and it was kept in a file with his name on it.

8          Q.    Okay.  So a physical copy only?

9          A.    I believe so, yeah.

10         Q.    And these were the records that you -- they

11   were removed from your office?

12         A.    Correct.

13         Q.    And this gentleman ---

14         A.    I believe were removed from my office.

15         Q.    And Mr. Gibson, you believe, is the one who

16   -- if they were removed, he's the one who removed them?

17         A.    Yes, I believe that because when I sent in

18   the van for them, by email, to an address that I know

19   belongs to him, I never received a response.

20         Q.    Okay.  So Mr. Gibson is unresponsive, and

21   his whereabouts are unknown at this time?

22         A.    Oh his whereabouts are perfectly known, he's

23   sitting right here.

24         Q.    Oh, okay, but he's been unresponsive?

25         A.    Correct.

Page 37

```
 1          Q.    Okay, and you said you were making some
 2    amendments to your schedules, is that correct?
 3          A.    I'm going to, yes.
 4          Q.    And is ---
 5          A.    Well, when you say your schedules, you mean
 6    Chance & Anthem's schedules?
 7          Q.    Chance & Anthem, yes.
 8          A.    Yes.
 9          Q.    Are you going to be amending any of the
10    entries relating to Mr. Volkwein?
11          A.    I hadn't intended to, no, but I guess if
12    Fred sits with me either individually or through your
13    firm, and can show me where my numbers are wrong, I would
14    amend based on his numbers if I thought they were correct.
15               MR. SWIFT:  Okay.  Thank you.
16               Mr. FURR:  Thank you.
17               Anybody else have any questions?
18               Yes, ma'am.
19               MS. WILLIAMS:  I'm Sophie Williams on behalf
20    of (inaudible) and Carl Stone.
21               MR. FURR:  (Inaudible.)
22                         EXAMINATION
23    BY MS. WILLIAMS:
24          Q.    Mr. Siskind, regarding your schedules for
25    Chance & Anthem, what materials did you use to prepare
```

Page 38

```
 1  them without your records?

 2         A.    I don't remember.

 3         Q.    Did you go by memory?

 4         A.    In part, yes.

 5         Q.    Did you use any bank records?

 6         A.    I don't recall what I used.

 7         Q.    Would you use any handwritten records?

 8         A.    I don't recall.  I said that three times

 9  now.

10         Q.    Okay.  I'm trying to specify, hoping maybe

11  it will trigger your memory.

12               Okay.  So with respect to the $300,000 that

13  you mentioned for the lease to own on the property in

14  Maryland, where -- what was the origination of that

15  $300,000?

16         A.    I don't recall.

17         Q.    Would it have come from Mr. Stone?

18         A.    No.

19         Q.    Mr. Fiore?

20         A.    No.

21         Q.    Would it have come from either Diana or

22  Christopher George?

23         A.    No.  Diana George is not a creditor.  She

24  has no basis for being a creditor.

25               Christopher George loaned $2 million to
```

1   Sovereign Gaming (phonetic), which then assisted with the

2   funding of Cannamed, but they had no direct privity with

3   Cannamed.

4           Q.    How much of the money was used for Cannamed

5   funding?

6           A.    I have no idea.

7           Q.    And you said that was through Sovereign

8   Gaming?

9           A.    Right, there are two promissory notes, as

10  you well know, totalling $2 million, which

11  Christopher George (inaudible) loaning that money to

12  Sovereign Gaming.

13          Q.    I have seen purported copies of the

14  purported promissory notes.

15          A.    And you've also seen the release that

16  David Fiore signed.

17          Q.    I have seen the purported release, yes.

18          A.    And the affidavit which Carl Stone provided?

19          Q.    I am familiar with Mr. Stone's affidavit, if

20  we're talking about the same one.  I don't know if there

21  is another one I don't know about.

22          A.    So you really don't represent any valid

23  creditors in this bankruptcy, do you?

24                MR. FURR:  Mr. Siskind ---

25  BY MS. WILLIAMS:

Page 40

```
 1              Q.    Did you ---
 2                    MR. FURR:  -- she gets to ask the questions.
 3    You don't.
 4                    THE WITNESS:  I just made the statement for
 5    the record then.
 6                    MS. WILLIAMS:  All right.
 7                    THE WITNESS:  But, Mr. Trustee, I will also
 8    state that I brought a listing of the valid creditors and
 9    she's not one, her clients aren't one it.
10                    MR. FURR:  All right.
11                    MS. WILLIAMS:  I don't ---
12                    THE WITNESS:  Mr. Neff is on it and
13    Mr. Volkwein is on it also.
14                    MS. WILLIAMS:  I will say for the record
15    that my clients have been noticed with regard to the
16    Chance & Anthem bankruptcy matters, and that is why I'm
17    here.  So whether or not Chance & Anthem claims them to be
18    valid creditors I think is another issue.
19                    MR. FURR:  That is another issue, and I
20    don't make that decision.
21                    MS. WILLIAMS:  All right.  I don't have
22    any ---
23                    MR. FURR:  There is a guy with a black robe
24    that does that.
25                    MS. WILLIAMS:  I don't have any other
```

1  questions.  Thank you.

2            THE WITNESS:  Did you say guy or gal?

3            MR. FURR:  Guy.  Why, who is this one?

4            THE WITNESS:  It's a gal.

5            MR. FURR:  A gal.

6            Anybody else have any questions?

7            If all the lawyers would just give their

8  card to Mr. Suarez, if you don't mind, so we can get in

9  touch with you, we'll be glad to do that and share any

10  information with you if you want to.

11            All right.  This meeting is concluded.

12  Thank you very much.

13

14

15            (Thereupon, the 341 Meeting of Creditors was

16  concluded.)

17

18

19

20

21

22

23

24

25

Page 42

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA        :

5    COUNTY OF MIAMI-DADE     :

6

7               I, Cheryl L. Jenkins, RPR, RMR, Shorthand

8    Reporter and Notary Public in and for the State of Florida

9    at Large, do hereby certify that the foregoing Section 341

10   Meeting of Creditors was transcribed by me from a digital

11   recording made on the date and at the place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record to the best

14   of my ability of said proceedings.

15               WITNESS my hand this 25th day of July, 2018.

16

17

18               _____

19                    CHERYL L. JENKINS, RPR, RMR

20                    Court Reporter and Notary Public
                   in and for the State of Florida at Large
21                        Commission #GG 138863
                          December 27, 2021
22

23

24

25