UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                                    Case No. 18-16248-BKC-MAM

CHANCE & ANTHEM, LLC,                                     Chapter 7

           Debtor.

_____/

**CHAPTER 7 TRUSTEE'S RESPONSE TO JEFFREY SISKIND'S RENEWED MOTION
FOR SANCTIONS [ECF NO. 173] AND REQUEST FOR SANCTIONS**

ROBERT C. FURR, the Chapter 7 Trustee for the above styled Debtor, Chance &
Anthem, LLC (the "Debtor"), files his Response (the "Response") to the Motion for Sanctions
("Motion")[1] filed by Jeffrey M. Siskind on behalf of the former management of the Debtor
("Movant" or "Siskind")[ECF No. 173]. In support of the Response, the Trustee states as
follows:

**Introduction**

1.      The Trustee's investigation to date reveals that the Debtor was little more than
one of many artifices employed by Jeffrey Siskind to part ''investors" from their money.  In
another misguided effort to take the offensive, Mr. Siskind asks the Court to sanction the Trustee
and his counsel for making argument in court papers that he admitted to commingling the
Debtor's money with his attorney trust account.    Mr. Siskind also makes not-so-veiled
insinuations about scope of the litigation immunity privilege.  Of course, he is signaling to the
Trustee and his counsel of his future intentions.[2]  We are not moved.

---

[1] The Motion fails to cite to any section of the Bankruptcy Code or Rules in support of the relief sought.

[2] There is no cash on this case.  Since the appointment of the Trustee and his counsel, Mr. Siskind has advanced
spurious objections to the Trustee's retention of counsel and forensic accountants; sought to remove the prior trustee
for not returning his phone calls and has generally acted  to increase the expense of administering the bankruptcy
estate.

2.      To be sure, Mr. Siskind admitted to commingling debtor funds with his attorney trust funds.  To date, he has failed to produce a single trust account record.  He claims the records were stolen.  No police report has been filed.  It is astounding that Mr. Siskind appears incapable of complying with Florida Bar Rule 5-1 (concerning the regulation of attorney trust accounts).  The Trustee and his counsel do not apologize for brining this troubling fact to the Court's attention.

**<u>Siskind's Testimony</u>**

3.      On June 9, 2018, the Trustee conducted and adjourned, without objection, a Section 341 Meeting of Creditors in this case.  Mr. Siskind appeared to testify on behalf of the Debtor.  Mr. Siskind was generally evasive, claiming not to recall the source or use of many of the Debtor's assets and liabilities. This is evident from a review of the transcript.  *See* 07/09/18 341 Hr'g Trans., a copy of which is annexed hereto as Exhibit "A" ("<u>341 Trans.</u>").

4.      Mr. Siskind claims that all pertinent records and trust account ledgers had been stolen by a rogue paralegal. 341 Trans. at  pp. 11:18-24; 12:1-9; 27:8-14.

5.      At the 341 Meeting of Creditors, Siskind testified to utilizing his trust account for transactions involving the Debtor in at least three separate instances.  Notably, the proceeds of said transactions cannot be reconciled with banks statements.

6.      The word "commingle" is a verb that means "to combine (funds or properties) into a common fund or stock."  Merriam Webster Dictionary (2018).  It cannot be disputed that Siskind testified to commingling Debtor assets with his attorney trust account.

7.      The first instance relates to a mortgage owned by the Debtor that Siskind sold to his business associate Frank Zokaites for $25,000 on October 12, 2017.  This transaction was not disclosed in the Debtor's Statement of Financial affairs. *See*  ECF No. 11.  Nonetheless, when Mr. Siskind was asked about this transaction at the Debtor's 341 meeting, he testified that

monies generated from the sale were deposited in his law firm through a "transfer account[3]."

Yet, those cannot be reconciled with a contemporaneous transfer from the trust account to the

Debtor's Bank Account.  *See* 341 Trans. at pp. 16:23-18:9.

Q.      What consideration did Chance & Anthem receive for the sale of that note and mortgage, if any?

A.      The tot -- Frank Zakitis who bought that note and mortgage, is that what you mean?

Q.      Yes.

A.      Received, I believe, a total of $25,000.

**Q.      Who received $25,000?**

**A.      I'm thinking that it went into the law firm, yeah.**

Q.      So when you sold Chance & Anthem's $25,000  mortgage and promissory note, Frank Zakitis paid your law firm $25,000?

A.      Well, I'm certain that he paid the 25 -- well, not a hundred percent certain of the amount, **but approximately $25,000, and I believe they all went through a transfer account into my law firm.**

Q.      Okay.

MR. FURR:

Q.      What's a "transfer account"?

THE WITNESS:

A:      It's just an account that was set up to handle transactions between the law firm and Frank Zakitis.

Q.      And is that a separate account?

A.      Yeah.
Q.      And where is that account located?

A.      PNC Bank.

---

[3] A lawyer must hold in trust, separate from the lawyer's own property, funds and property of clients or third persons that are in a lawyer's possession in connection with a representation.  Florida Bar Rule 5-1.1(a).

> Q.    What's the name of the account?
>
> A.    Siskind Legal Services, LLC.
>
> Q:    And it's only used to transfer monies between your law firm and other parties?
>
> A:    That's why it originally existed. Frank Zakitis is located in Pittsburgh, and when he would pay bills, he would pay them at PNC.  He kept the account at PNC down here.
>
> Q:    And that PNC account, is that still open?
>
> A.     Yeah.

8.    Mr. Siskind also testified that money purportedly invested by Carl Stone in the Debtor was deposited in his attorney trust account.  Again, those funds cannot be reconciled with a corresponding deposit in the Debtor Bank Account.   341 Trans. at p. 19:2-15 (emphasis supplied).

> Q:    Who were those private lenders?
>
> A:    I believe one member was Richard Niff, and another one was Carl Stone and/or David Fiore.
>
> Q.    Were monies from Richard Niff and David Fiore deposited into Chance & Anthem's bank account at J.P. Morgan?
>
> A.    I don't believe so, no.
>
> Q.     All right. Where were those monies funded from for that purchase?
>
> A.    Oh, I think one was. Yeah, I think Mr. Neff's money did go through the Chance & Anthem account. Don't hold me to that, but I'm pretty sure that's where that, and then **Carl Stone's money was deposited into my attorney trust account.**

9.    Mr. Siskind also testified that money purportedly invested by Mr. Volkwein in the Debtor was also deposited in his attorney trust account.  And yet again, those funds cannot be reconciled with a corresponding deposit in the Debtor Bank Account. 341 Trans. at p. 25:2-25

(emphasis supplied).

Q:      And how much money did Mr. Volkwein lend to Chance & Anthem?

A.      Well, according to my records $500,000.

Q.      All right, and how was that loan documented?

A.      I don't remember. I remember that I have a or had a power of attorney from Mr. Volkwein. Those funds came from properties that he sold at some point, which my firm handled the sale transaction of.

Q.      And where were the funds loaned by Mr. Volkwein deposited?

A.      I don't recall. **I imagine they ran through my trust account**, since we did the closing. Well, we didn't do the closing, but we represented him in the closing of the sale of properties he had in West Palm Beach.

Q.      And you represented him in the loan that he made to Chance & Anthem?

A.      No, I don't believe so.

Q.      Was he represented by anyone in connection with the loan he made to Chance & Anthem?

A.      No.

Q.      What were the terms of the loan he made to Chance & Anthem?

A.      I don't remember.

10.     Finally, Siskind testified that his attorney trust account bank records were used by him to prepare reconciliations of transactions involving the Debtor. The reconciliations, however, are now missing and Siskind has no ability to produce contemporaneous records to identify these transactions.

Q.      And what were Mr. Volkwein's $500,000 used for?

A.      I don't recall. At some point the history of his interest, I provided him with paperwork on that, but beyond that you'd have to ask him.

Q.      What paperwork did you provide him?

A.      Just a disbursement sheet as to where his money was used.

Q.      How was that disbursement sheet generated?

A.      By hand by me.

Q.      And what documents would you have reviewed to generate that disbursement sheet?

A.      It was more or less a ledger that I kept on him that I would update from time to time.

Q.      What documents would you use to create that ledger?

A.      Just my bank records at the time.

Q.      The bank records of Chance & Anthem?

A.      I don't remember whether I ever utilized Chance & Anthem's records to facilitate that report, no.

**Q.      Would those have been your trust account  records?**

**A.      Some would have been, yeah.**

Q.      All right. So other than your trust account records and Chance & Anthem records, if at all, what other records would you have reviewed to create that ledger?

A.      I don't remember what bank account records, were involved in the review, but the one-page report that I gave was accurate.

Q.      Whatever happened to that ledger?

A.      It was with the books and records that were in my files when we vacated the office at 525 South Flagler.

Q.      Those are the ones that you've testified Mr. Gibson took possession of?
A.      I believe he removed them, yes.

Q.      Have you filed a police report for the 16 missing files?

A.      No, I didn't think the police report would be availing, because I did give him permission to take all of the dead files, and the understanding was the live files would come out to the project house in Santa Barbara, and the dead files, rather than discard them, he would remove and keep in his garage at his house.

11.    The Trustee respectfully requests an award of sanctions against Mr. Siskind for the fees and costs incurred in responding to the Motion.  A finding of bad faith supporting imposition of sanctions under court's inherent powers is warranted where an attorney knowingly or recklessly raises a frivolous argument or argues a meritorious claim for purposes of harassing an opponent.  *In re Creative Desperation Inc.*, 415 B.R. 882, 895 (Bankr. S.D. Fla. 2009).  An award of sanctions is appropriate here because the Motion raises only frivolous arguments made in bad faith and with complete and reckless disregard as to any legal or factual basis for the relief requested.

**WHEREFORE**, the Trustee respectfully requests entry of an order, (i) denying Jeffrey Siskind's Motion for Sanctions; (ii) awarding attorney's fees and costs incurred by the Trustee and his counsel in opposing the Motion; and (iii) granting such other relief as this Court deems just and proper.

Respectfully submitted on November 8, 2018.

**GENOVESE JOBLOVE & BATTISTA, P.A.**
*Attorneys for Chapter 7 Trustee*
Miami Tower- 44th Floor
100 S.E. Second Street
Miami, Floirda 33131
Telephone: (305) 349-2300
Facsimile: (305) 428-8831

By: /s/  *Jesus M. Suarez*
        Jesus M. Suarez, Esq.
        Florida Bar No. 60086
        jsuarez@gjb-law.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been served upon all creditors and parties in interest registered to receive electronic notice via the Court's Case Management/Electronic Case Filing System as reflected on the attached Service List below on this 8th day of November, 2018.

　/s Jesus M. Suarez　　　　　
Jesus M. Suarez, Esq.

**SERVICE LIST**

***Parties to receive electronic notice via CM/ECF***

Robert C Furr
danderson@furrcohen.com, rcf@trustesolutions.net

John H Genovese, Esq on behalf of Trustee Robert C Furr
jgenovese@gjb-law.com, hburke@gjb-law.com;gjbecf@gjb-law.com;gjbecf@ecf.courtdrive.com

Steven S. Newburgh: snewburgh@mclaughlinstern.com

Office of the US Trustee: USTPRegion21.MM.ECF@usdoj.gov

Jeffrey M Siskind: jeffsiskind@msn.com, jmsesq500@gmail.com

Jesus M Suarez on behalf of Trustee Robert C Furr
jsuarez@gjb-law.com, gjbecf@gjb-law.com;chopkins@gjb-law.com;jzamora@gjb-law.com;ecastellanos@gjb-law.com;gjbecf@ecf.courtdrive.com

Stuart A Young, Esq: syoung@ybplaw.com

# EXHIBIT "A"

Page 1

1            UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF FLORIDA

2

3

IN RE:                 CASE NO. 18-16248-MAM

4

  CHANCE & ANTHEM, LLC

5

          Debtor.

6 _____/

7

8           341 MEETING OF CREDITORS

9             July 9, 2018

10        The above-entitled cause came on for a Section

11 341 Meeting of Creditors before ROBERT FURR, one of the

12 trustees in the UNITED STATES BANKRUPTCY COURT, in and for

13 the SOUTHERN DISTRICT OF FLORIDA, at 1515 North Flagler

14 Dr., West Palm Beach, Palm Beach County, Florida on July

15 9, 2018, commencing at or about 8:30 a.m., and the

16 following proceedings were had.

17

18

19

20

21       Transcribed from a digital recording by:
        Cheryl L. Jenkins, RPR, RMR

22

23

24

25

Page 2

```
 1
 2                     APPEARANCES:
 3
                     ROBERT FURR, Trustee
 4
 5            GENOVESE JOBLOVE & BATTISTA, by
                     JESUS M. SUAREZ, Esquire
 6               On behalf of the Trustee
 7
                     TRENT SWIFT, Esquire
 8               On behalf of Richard Niff
 9
                     MAX ARESTY, Esquire
10            On behalf of Frederick Volkwein
11
                     SOFIYE WILLIAMS, Esquire
12                On behalf of Carl Stone
13                   - - - - - - -
14
15               WITNESS
    Jeffrey Siskind                    Page
16       Examination by Mr. Furr         3
         Examination by Mr. Suarez      11
17       Examination by Mr. Swift       31
         Examination by Mr. Aresty      33
18       Examination by Mr. Williams    37
19
20
21
22
23
24
25
```

Page 3

1              MR. FURR:  Trustee calls Case

2    Number 18-16248, Chance & Anthem, LLC.

3              MR. SISKIND:  Do you want me on this side,

4    Robert?

5              MR. FURR:  Right there is fine.

6              Please raise your right hand.

7              Do you swear to tell the truth, the whole

8    truth and nothing but the truth?

9              MR. SISKIND:  I do.

10   Thereupon,

11                    JEFFREY SISKIND,

12   having been first duly sworn, was examined and testified

13   as follows:

14              MR. FURR:  For the record I've verified

15   Mr. Siskind's address, and identity and will return it

16   back to him, and I also know him.

17                    EXAMINATION

18   BY MR. FURR:

19        Q.    Please state your name.

20        A.    Jeffrey Mark Siskind.

21        Q.    Mr. Siskind, what's your position with

22   Chance & Anthem?

23        A.    I was the managing member.

24        Q.    Did you file this bankruptcy up in Baltimore

25   originally?

Page 4

1          A.     In Maryland, yes.

2          Q.     In Maryland.  Are you still the managing

3   member?

4          A.     Well, that's a legal question.  I guess you

5   could answer it better than I can.  I was the last

6   managing member.

7          Q.     Okay.  No one -- you didn't resign?

8          A.     No, I did not.

9          Q.     In Baltimore you filed the petition, and

10  when you signed the petition, did you sign it?

11         A.     Yes.

12         Q.     As the managing member?

13         A.     Either as that or counsel to the ---

14         Q.     Okay.  I just see your signature on there on

15  February the 12th, 2018.  That's your signature?

16         A.     Well, the petition had my signature.

17         Q.     Let me just show you, make sure you

18  understand.

19         A.     Yes.

20         Q.     The one right there.  Okay, and the

21  information in the original petition, summary of assets,

22  schedules of assets, were those true and correct?

23         A.     To the best of my knowledge at the time,

24  yes.

25         Q.     Do you wish to make any amendments to those

Page 5

1    schedules?

2              A.    We're going to make amendments, yes.

3              Q.    Okay, and you say "we", does that mean

4    somebody else with you?

5              A.    The company "we".  I should say I.

6              Q.    Right.  Can you tell me when Chance & Anthem

7    was formed?

8              A.    No, I don't remember when it was formed, but

9    it's on the SunBiz site.

10             Q.    Okay, and did you form it?

11             A.    Yes.

12             Q.    So what in these schedules is inaccurate

13   that you listed on the original schedules, petition and

14   statement of financial affairs, or are you going add more

15   information to it?

16             A.    We're going to add information, but I

17   remember that there was a date that was incorrect as to

18   when we vacated a property in Maryland that the company

19   was utilizing.

20             Q.    All right.  Has Chance & Anthem ever filed

21   tax returns?

22             A.    No, it never made any money.

23             Q.    I didn't ask that.  I said, did it ever file

24   tax returns --

25             A.    No.

Page 6

1        Q.      -- and you should know.

2                Okay.  There was a tax return -- there was a

3    significant claim filed, one claim filed in the case so

4    far by Del Marva Power in Carney's Point, New Jersey.  It

5    looks like a power company.

6        A.      Correct.

7        Q.      And this is an electric bill for property at

8    27120 Ocean Gateway, or Gtwy, in Hebron, Maryland.  Can

9    you tell me, are you familiar with that address?

10       A.      Certainly.

11       Q.      And what is that, what building or property

12   is located there?

13       A.      There is a 47,000-square foot building,

14   approximately, located on just under seven acres, which

15   the company had a lease purchase agreement --

16       Q.      Okay.

17       A.      -- on.

18       Q.      And who are they lease purchasing it from?

19       A.      27120 Ocean Gateway, LLC.

20       Q.      Who owns that company, that was Ocean

21   Gateway company you just mentioned?

22       A.      That company is owned by a fellow by the

23   name of Alan Bias.

24       Q.      How do you spell Mr. Bias' last name?

25       A.      B-i-a-s.

Page 7

1          Q.    And who is Mr. Bias, do you know him?

2          A.    Yes.

3          Q.    Business associate of yours?

4          A.    No, except for that deal.

5          Q.    Okay.  A total third party?

6          A.    Yes, arm's length third party.

7          Q.    And then was there actually a written lease

8    for that?

9          A.    There was a lease option agreement, yes.

10          Q.    And do you have a copy of that lease option

11    agreement?

12          A.    I don't know if I still have a copy, but I'm

13    sure that Mr. Bias would be more than willing to give it

14    to you.

15          Q.    And can you tell me the terms of the lease

16    option agreement?

17          A.    I think it was monthly payments of about

18    7,361, if my memory serves me correctly, and then there

19    was an option for a buyout at, I think it was 700,000.  It

20    might have been 750,000.

21          Q.    And did you pay a down payment on that lease

22    option when you signed it?  I assume you signed it on

23    behalf of Chance & Anthem?

24          A.    Yes.

25          Q.    So when you signed it, did you put down

Page 8

1    $100,000, 50,000, or some amount of money as a deposit?

2         A.   I think we put down $300,000 when the

3    building was purchased.

4         Q.   Okay.  So was the building actually in the

5    name of Chance & Anthem?

6         A.   Never.

7         Q.   So it wasn't purchased?

8         A.   The building was purchased by 27120 Ocean

9    Gateway, LLC from a company, a gas company up there that

10   owned it.

11        Q.   Okay, and so ---

12        A.   Wait a minute.  If my memory serves me

13   correctly, that's the way it was structured.

14        Q.   Okay, and so you put the $300,000 down, you

15   being Chance & Anthem?

16        A.   Well, I believe Chance & Anthem put that

17   money down.

18        Q.   Okay, and so the building was not purchased

19   in Chance & Anthem's name?

20        A.   No.

21        Q.   The name of the other company?

22        A.   Correct.  Well, let me think about that.  I

23   guess it would have to have been yeah.  Yes, yes.

24        Q.   Okay, and who is occupying that building

25   today?

1          A.    I have no idea.

2          Q.    When was the last time you were there?

3          A.    I don't remember, whenever I thought that we

4    vacated it, I guess, is the last time.

5          Q.    At the height of your occupancy, or Chance &

6    Anthem's occupancy of the building, if I went there, would

7    I find a staff of people working there?

8          A.    Yes.

9          Q.    Would I find the marijuana growing

10   operation?

11         A.    It would have been.  It was not.  There were

12   no plants on site.

13         Q.    But that's what you were going to do in the

14   building, was grow marijuana in it?

15         A.    Correct.

16         Q.    But you never did?

17         A.    Correct.

18         Q.    So what did you actually do there other than

19   just open up an office?

20         A.    We were renovating the building.

21         Q.    Okay.  How much did you spend on the

22   renovation?

23         A.    I don't remember.

24         Q.    Would it be Chance & Anthem that spent the

25   money?

1          A.    I believe so.

2          Q.    Would Chance & Anthem's bank records, the

3    bank checkbook show the payments for the renovation?

4          A.    It should.  It might not show all of them,

5    but there were payments to individuals who were working on

6    the site, subcontractors, you should see those, yeah.

7          Q.    And those -- was there a separate checking

8    account in Maryland for that purpose?

9          A.    No.

10         Q.    Just the checking account for the company

11   here that you've already provided us?

12         A.    Yeah, there were no other accounts in other

13   -- out of state.

14         Q.    Are there any other unpaid utility bills

15   such as this?

16         A.    Utility bills?

17         Q.    Yes.

18         A.    Well, let's see, there is a little over $800

19   due a trash disposal company.

20         Q.    Right.

21         A.    And are you asking that question regarding

22   that specific property only?

23         Q.    No, anything.

24         A.    Anything, okay.  There is a pool service

25   company that's owed money, $600.

1          Q.    Pool service?

2          A.    Uh-huh.

3          Q.    Did the company have a swimming pool?

4          A.    No, the project that we had in Florida,

5   which was the renovation of a house, has a pool.

6          Q.    Okay.  Did Chance & Anthem own a house in

7   Florida in was renovating?

8          A.    Yes.

9          Q.    Did it actually have a house in its name?

10          A.    I believe so.

11          MR. FURR:  I've got an attorney here,

12   Mr. Suarez, who is going to ask you a few questions.  I'm

13   going to turn it over to him, and then there may be some

14   creditors here.  You're also welcome to ask questions if

15   you are a creditor.

16                         EXAMINATION

17   BY MR. SUAREZ:

18          Q.    So, Mr. Siskind, good morning.  We've met

19   before.  My name is Jesus Suarez.  My firm is proposed

20   counsel to the Chapter 7 trustee.

21              Does Chance & Anthem have any books and

22   records?

23          A.    There were books and records which were

24   removed from my office at one point in time, yes.

25          Q.    Where were they moved to?

1          A.    I don't know.

2          Q.    Who removed them?

3          A.    Robert Gibson.

4          Q.    All right, and why did Mr. Gibson remove

5     them?

6          A.    He took all my files.  He was supposed to

7     only take the dead files, but when I went into the

8     cabinet, which I thought contained my live files, it was

9     empty.

10         Q.    All right, and did you ever use a computer

11    to transact business for Chance & Anthem or send emails on

12    behalf of ---

13         A.    Correspondence, emails, yes.

14         Q.    From what email address?

15         A.    Just from my personal address.

16         Q.    What email address is that?

17         A.    JeffSiskind@msn.com.

18         Q.    Did you use any other electronic form of

19    communication on behalf of Chance & Anthem?

20         A.    No.

21         Q.    In the debtor's schedules you listed a

22    computer, a printer and a monitor belonging to Chance &

23    Anthem with an estimated value of $150.

24         A.    Correct.

25         Q.    Where is that right now?

1          A.    The last I saw it it was in the facility in

2    Maryland.

3          Q.    What facility in Maryland is that?

4          A.    The building that we were talking about,

5    which is located at 27120 Ocean Gateway.

6          Q.    And was that facility vacated before April

7    of 2018?

8          A.    Yes.

9          Q.    All right.  So the last time you saw those

10   books and records was before April of 2018?

11         A.    No, that's the last time I saw the computer.

12   I don't remember when the last time I saw the books and

13   records was.

14         Q.    I'm sorry, the computer.

15         A.    Yes.

16         Q.    Where is that computer right now?

17         A.    I have no idea.

18         Q.    You left it in the warehouse in Maryland?

19         A.    As I stated, the last time I saw it it was

20   in the warehouse in Maryland.

21         Q.    All right, and you turned over the warehouse

22   in Maryland to Ocean Gateway, is that correct?

23         A.    Yes.

24         Q.    All right, and at that time ---

25         A.    When you say Ocean Gateway, you mean the

Page 14

1    LLC, 27120 Ocean Gateway, LLC?

2            Q.    Owned by Mr. Bias.

3            A.    I believe it's owned by Mr. Bias.  It's, I

4    believe, a Fla -- well, it might be a Maryland limited

5    liability company, but they have the same sort of on-line

6    service that you can check to get whatever information you

7    need about it.

8            Q.    Do you have any interest in that entity?

9            A.    No.

10            MR. FURR:  Do you have a phone number for

11   Mr. Bias?

12            THE WITNESS:  No.  I do, I can get it for

13   you.

14            MR. FURR:  Would you please get that for

15   me --

16            THE WITNESS:  Sure.

17            MR. FURR:  -- so I can contact him.

18   BY MR. SUAREZ:

19            Q.    On October 12th, 2017, Chance & Anthem

20   transferred and assigned a promissory note and mortgage

21   encumbering property in Cross Creek, owned by Mr. and

22   Mrs. Emmet Tias (phonetic) and Zoreda Mohammed (phonetic).

23   Are you familiar with them?

24            A.    Sure.

25            Q.    All right.  How did the debtor come to own

1    that note and mortgage?

2          A.    The debtor bought that note and mortgage

3    from an individual lender named George Maylor (phonetic).

4          Q.    And how much did the debtor pay for that

5    note and mortgage?

6          A.    $27,250.

7          Q.    And where did that money come from?

8          A.    I don't recall.

9          Q.    Would it have been paid from the debtor's

10   bank account at JP Morgan?

11         A.    I think so.  I'm not totally positive, but

12   probably.

13         Q.    All right.  If it wasn't paid from the

14   debtor's bank account at J.P. Morgan, where would it have

15   been paid from?

16         A.    I don't know.  It might have been my law

17   office account.

18         Q.    All right, and when would it have been paid

19   from by your law office account?

20         A.    I have no idea why ---

21         Q.    Was your law office account holding monies

22   for Chance & Anthem?

23         A.    Not that I recall, but we represented George

24   Maylor, and of course we also represented Chance & Anthem,

25   which I owned a hundred percent of.

1        Q.    When you say "we", who is "we"?

2        A.    The company "we".  Forgive me, I always say

3   that.  I.

4        Q.    Who is the company "we"?

5        A.    Siskind Legal.

6        Q.    Is that an LLC?

7        A.    Siskind Legal Services, LLC did exist at one

8   time, but it's lapsed.

9        Q.    All right.  So when you say that the

10  company, we, paid for Chance & Anthem's purchase of this

11  mortgage, that it came from the law firm, what law firm is

12  that?

13       A.    Well, it's my law firm, if it indeed came

14  from there.  I'd have to look.

15       Q.    Okay.  So it might have come from somewhere

16  else?

17       A.    It could have, but it's not hard to figure

18  out where it came from.  I'm sure I have a record of that

19  check.

20       Q.    And you represented Chance & Anthem in that

21  transaction?

22       A.    Correct.

23       Q.    What consideration did Chance & Anthem

24  receive for the sale of that note and mortgage, if any?

25       A.    The tot -- Frank Zakitis who bought that

1    note and mortgage, is that what you mean?

2            Q.    Yes.

3            A.    Received, I believe, a total of $25,000.

4            Q.    Who received $25,000?

5            A.    I'm thinking that it went into the law firm,

6    yeah.

7            Q.    So when you sold Chance & Anthem's $25,000

8    mortgage and promissory note, Frank Zakitis paid your law

9    firm $25,000?

10           A.    Well, I'm certain that he paid the 25 --

11   well, not a hundred percent certain of the amount, but

12   approximately $25,000, and I believe they all went through

13   a transfer account into my law firm.

14           Q.    Okay.

15               MR. FURR:  What's a "transfer account"?

16               THE WITNESS:  It's just an account that was

17   set up to handle transactions between the law firm and

18   Frank Zakitis.

19               MR. FURR:  And is that a separate account?

20               THE WITNESS:  Yeah.

21               MR. FURR:  And where is that account

22   located?

23               THE WITNESS:  PNC Bank.

24               MR. FURR:  What's the name of the account?

25               THE WITNESS:  Siskind Legal Services, LLC.

Page 18

1              MR. FURR:  And it's only used to transfer

2    monies between your law firm and other parties?

3              THE WITNESS:  That's why it originally

4    existed.  Frank Zakitis is located in Pittsburgh, and when

5    he would pay bills, he would pay them at PNC.  He kept the

6    account at PNC down here.

7              MR. FURR:  And that PNC account, is that

8    still open?

9              THE WITNESS:  Yeah.

10              MR. FURR:  Sorry.

11   BY MR. SUAREZ:

12        Q.    On August 25th, 2015, the debtor bought real

13   estate at 3445 Santa Barbara Drive, is that correct?

14        A.    I'm not sure of the date, but that's the

15   project house that we were talking about.

16        Q.    All right, and what do you mean by the

17   "project house"?

18        A.    It's a house that was purchased from

19   J.P. Morgan Chase to renovate and sell.

20        Q.    And what was the source of funds used to

21   purchase that house?

22        A.    I don't remember exactly, but we paid

23   approximately $1,250,000 for it.

24        Q.    Where did that million two fifty come from?

25        A.    I don't remember.  Give me a moment.  I can

Page 19

1    probably think.  Private lenders.

2         Q.    Who were those private lenders?

3         A.    I believe one member was Richard Niff, and

4    another one was Carl Stone and/or David Fiore.

5         Q.    Were monies from Richard Niff and

6    David Fiore deposited into Chance & Anthem's bank account

7    at J.P. Morgan?

8         A.    I don't believe so, no.

9         Q.    All right.  Where were those monies funded

10   from for that purchase?

11        A.    Oh, I think one was.  Yeah, I think

12   Mr. Neff's money did go through the Chance & Anthem

13   account.  Don't hold me to that, but I'm pretty sure

14   that's where that, and then Carl Stone's money was

15   deposited into my attorney trust account.

16        Q.    Were those investments in Chance & Anthem

17   documented?

18        A.    Sure.

19        Q.    How were they documented?

20        A.    I don't remember.

21        Q.    Did you represent Chance & Anthem in

22   documenting those transactions?

23        A.    Well, there was no one else to represent

24   Chance & Anthem, so I guess you could say that I did.

25        Q.    Did you represent Mr. Neff in documenting

Page 20

1    those transactions?

2              A.    No.

3              Q.    Did you represent Mr. Stone or Mr. Fiore in

4    documenting those transactions?

5              A.    No.

6              Q.    Have you ever represented Mr. Stone or

7    Mr. Fiore?

8              A.    No, as to Stone.  Yes, as to Fiore.

9              Q.    All right.  Did you represent Mr. Fiore in

10   any matters related to Chance & Anthem?

11             A.    Not that I recall, no.

12             Q.    Chance & Anthem took a mortgage out from New

13   Wave Loans Residential, LLC in about November of 2015 --

14             A.    I don't recall --

15             Q.    -- is that correct?

16             A.    -- the date, but that was a mortgage that we

17   borrowed, yeah, against the project house.

18             Q.    When you say "we", who do you mean "we"?

19             A.    Chance & Anthem.

20             Q.    Okay, and where were those funds deposited?

21             A.    I don't remember.

22             Q.    Would they have been deposited at the

23   debtor's bank account at J.P. Morgan?

24             A.    I don't remember.

25             Q.    Is there anywhere else, besides the debtor's

Page 21

1    bank account, where they would have been deposited?

2         A.    I don't remember where they were deposited.

3         Q.    All right, and what were those funds used

4    for?

5         A.    They were used toward the Maryland marijuana

6    growing project.

7         Q.    What you say the marijuana growing project

8    in Maryland, do you mean the marijuana project that

9    Cannamed Pharmaceuticals was --

10        A.    Correct.

11        Q.    -- operating?

12              In March ---

13        A.    Well, let's stop, not operating, but

14    developing.

15        Q.    Okay, developing.

16              What was the difference between the debtor

17   and Cannamed Pharmaceuticals, what did the debtor do in

18   Maryland, and what did Cannamed Pharmaceuticals do?

19        A.    The debtor owns 70 percent of Cannamed

20   Pharmaceuticals.

21        Q.    Okay.  Is the debtor's ownership in Cannamed

22   Pharmaceuticals documented in any way?

23        A.    It was.

24        Q.    How?

25        A.    There is a certificate of, I don't know what

Page 22

1    you call it, because it's an LLC, a unit interest

2    certificate.

3              Q.    And where is that ---

4              A.    With the files that are missing.

5              Q.    Did you ever have those on a computer?

6              A.    No.

7              Q.    Did you ever email them to anybody?

8              A.    No.  When you saw "them", you're talking

9    about the certificates --

10             Q.    The certificates.

11             A.    -- in favor of ---

12             Q.    Sure.

13             A.    No.

14             Q.    Who owned the other 30 percent of Cannamed?

15             A.    I personally own 5 percent, still do.  An

16   individual by the name of Bruce Lowe owns 5 percent, and

17   the rest I don't recall.

18             Q.    On March 23rd of 2016 there was a mortgage

19   recorded in favor of EBK South Properties, LLC against the

20   Santa Barbara house --

21             A.    Correct.

22             Q.    -- for about a half a million dollars,

23   $500,000.

24             A.    No.  There was a line of credit, I think the

25   actual borrowing against that house was, if memory serves

Page 23

1    me correctly, 160,000.

2         Q.    And where were those $160,000 deposited?

3         A.    I don't remember, but the funds were used

4    for Cannamed.

5         Q.    For Cannamed?

6         A.    On behalf of -- yeah, payment of Cannamed

7    expenses, to the best of my recollection.

8         Q.    Were the funds deposited in Chance &

9    Anthem's account at J.P. Morgan?

10        A.    I don't remember where those were deposited.

11        Q.    Why was Chance & Anthem funding Cannamed's

12    expenses?

13        A.    Because that was the agreement, Chance &

14    Anthem assisted -- Cannamed had no income, so Chance &

15    Anthem provided all the funding that Cannamed needed.

16        Q.    Why was Cannamed incapable of procuring that

17    funding for itself?

18        A.    It was more or less a shell company.

19        Q.    Did Chance & Anthem ever have any income?

20        A.    No.

21        Q.    Did Chance & Anthem have any business

22    operations?

23        A.    Other than what we've discussed, no.

24        Q.    Did Chance & Anthem ever sell anything?

25        A.    That one mortgage that we spoke about.

1          Q.    Did Chance & Anthem ever produce anything?

2          A.    What do you mean by produce?

3          Q.    Did it ever make anything?

4          A.    Actually make a tangible product, no.

5          Q.    Okay.  You said there was an agreement

6    between Chance & Anthem and Cannamed?

7          A.    Yes.

8          Q.    How was that agreement documented?

9          A.    There was a document which required Chance &

10   Anthem to fund Cannamed in exchange for its unit

11   interests.

12         Q.    And where can I find that document?

13         A.    With all the other documents that are taken

14   from my office by Mr. Gibson.

15         Q.    That document was never scanned?

16         A.    No.

17         Q.    Was never emailed to anybody?

18         A.    Not that I recall, no.

19         Q.    So it would only have ever existed in a hard

20   file?

21         A.    Yes, and it was a one-page piece of paper, I

22   remember looking at it.

23         Q.    Whose Fredrick Volkwein?

24         A.    He is a valid creditor of Chance & Anthem.

25   He's an individual who I've known for probably 30 years

Page 25

1    here in West Palm Beach.

2            Q.    And how much money did Mr. Volkwein lend to

3    Chance & Anthem?

4            A.    Well, according to my records $500,000.

5            Q.    All right, and how was that loan documented?

6            A.    I don't remember.  I remember that I have a

7    -- or had a power of attorney from Mr. Volkwein.  Those

8    funds came from properties that he sold at some point,

9    which my firm handled the sale transaction of.

10           Q.    And where were the funds loaned by

11   Mr. Volkwein deposited?

12           A.    I don't recall.  I imagine they ran through

13   my trust account, since we did the closing.  Well, we

14   didn't do the closing, but we represented him in the

15   closing of the sale of properties he had in West Palm

16   Beach.

17           Q.    And you represented him in the loan that he

18   made to Chance & Anthem?

19           A.    No, I don't believe so.

20           Q.    Was he represented by anyone in connection

21   with the loan he made to Chance & Anthem?

22           A.    No.

23           Q.    What were the terms of the loan he made to

24   Chance & Anthem?

25           A.    I don't remember.

1          Q.     Who would know?

2          A.     I would know if I had the ability to look at

3     the file, but -- or Fred would know.

4          Q.     And what were Mr. Volkwein's $500,000 used

5     for?

6          A.     I don't recall.  At some point the history

7     of his interest, I provided him with paperwork on that,

8     but beyond that you'd have to ask him.

9          Q.     What paperwork did you provide him?

10         A.     Just a disbursement sheet as to where his

11    money was used.

12         Q.     How was that disbursement sheet generated?

13         A.     By hand by me.

14         Q.     And what documents would you have reviewed

15    to generate that disbursement sheet?

16         A.     It was more or less a ledger that I kept on

17    him that I would update from time to time.

18         Q.     What documents would you use to create that

19    ledger?

20         A.     Just my bank records at the time.

21         Q.     The bank records of Chance & Anthem?

22         A.     I don't remember whether I ever utilized

23    Chance & Anthem's records to facilitate that report, no.

24         Q.     Would those have been your trust account

25    records?

1          A.     Some would have been, yeah.

2          Q.     All right.  So other than your trust account

3    records and Chance & Anthem records, if at all, what other

4    records would you have reviewed to create that ledger?

5          A.     I don't remember what bank account records

6    were involved in the review, but the one-page report that

7    I gave was accurate.

8          Q.     Whatever happened to that ledger?

9          A.     It was with the books and records that were

10   in my files when we vacated the office at 525 South

11   Flagler.

12         Q.     Those are the ones that you've testified

13   Mr. Gibson took possession of?

14         A.     I believe he removed them, yes.

15         Q.     Have you filed a police report for the

16   missing files?

17         A.     No, I didn't think the police report would

18   be availing, because I did give him permission to take all

19   of the dead files, and the understanding was the live

20   files would come out to the project house in Santa

21   Barbara, and the dead files, rather than discard them, he

22   would remove and keep in his garage at his house.

23         Q.     What's the current status of the project

24   house?

25         A.     The project house is owned by a company

1  controlled by Frank Zakitis, and it has been sitting

2  because of permit issues, but I understand that the plans

3  were just approved, and the permit should be issued today

4  or later this week.

5          Q.    What's your current involvement with the

6  project house?

7          A.    I don't have any official involvement with

8  that house.  It's located next to my house, so I do keep

9  an eye on it.

10          Q.    What's your unofficial involvement with the

11  house?

12          A.    Just keep an eye on it.

13          Q.    Do you have any interest in the house?

14          A.    No.

15          Q.    Do you have any agreement with Mr. Zakitis

16  concerning the disposition of that house?

17          A.    Nothing in writing.

18          Q.    Do you have any agreement that's not in

19  writing concerning the disposition of that house?

20          A.    Well, nothing that's enforceable since it

21  pertains to real estate, and would be barred by the

22  statute of frauds if it wasn't in writing.

23          Q.    That's not the question I'm asking.  I'm

24  asking what the agreement is.

25          A.    There is no official agreement.  I hope that

1    Frank will make some money on the house when he sells it,

2    and that he will do something for my creditors.

3             Q.    Okay.  Well, considering that Mr. Furr is

4    the trustee of those creditors, we'd like to know what the

5    unofficial agreement is, or what understanding you might

6    have, or what your expectation might be of what

7    Mr. Zakitis will do once he sells the house.

8             A.    I don't have any expectation.  There is no

9    articulated agreement at this point.

10            Q.    Is there an unarticulated agreement?

11            A.    No.

12            Q.    Okay.  Well, you've defined it as an

13   articulated agreement.  I was simply trying to define

14   whether there was an unarticulated or unofficial

15   agreement.

16            A.    Well, I mean, you know, Frank and I have

17   been friends for 25 years.  So we talk a lot, but whether

18   you could say that there was an enforceable agreement from

19   those conversations, the answer would be no.

20            Q.    Are you Frank's lawyer?

21            A.    I have been, yeah, on different things.  He

22   has many lawyers that help him.

23            Q.    Do you represent him in connection with any

24   matters having to do with Chance & Anthem?

25            A.    Yes.

Page 30

1          Q.    What matters?

2          A.    Well, no, I represented him in a mortgage

3    foreclosure suit against the Mohammeds, which mortgage was

4    once held by Chance & Anthem.

5          Q.    Any other matters related to Chance & Anthem

6    where you represented Mr. Zakitis?

7          A.    Not that I recall.

8          Q.    Are there any communications with

9    Mr. Zakitis concerning the Mohammeds' mortgage?

10          A.    Oh, sure.  Every time something is filed, he

11    gets a copy of it.  Well, not every time.  There are a few

12    times that I forgot to send it to him but, yeah, he gets

13    all that stuff eventually.

14          Q.    Do you communicate with him by email?

15          A.    Sometimes.

16          Q.    From your, I think you said it was your MSN

17    account?

18          A.    Always, yeah.

19          Q.    Do you use any other email accounts?

20          A.    No.  Well, I do have a Gmail account, but I

21    don't use it.

22                MR. SUAREZ:  Okay.  I'm good.

23                MR. FURR:  Any other creditors have

24    questions?

25                If anybody is here representing a creditor

Page 31

1    I'd like to know who they are.  So announce their

2    representation on the record.

3                    MR. SWIFT:  Your Honor, Trent Swift on

4    behalf of Richard Neff.

5                    MR. FURR:  Do you have any questions,

6    Mr. Swift?

7                         EXAMINATION

8    BY MR. SWIFT:

9         Q.    Mr. Siskind, you said that there was no

10   official agreement, and that there is no articulated

11   agreement.  Do you have plans at some point to articulate

12   an agreement or make an official agreement with the

13   Mr. Zakitis concerning the investment property?

14        A.    Yes.

15        Q.    And what is that intention?

16        A.    Well, I've got to wait until this permit

17   issue fiasco is over before I think I should approach

18   Frank on something like that.  The property has been

19   sitting for many months, I don't know exactly how long,

20   but there is a little bit of friction due to that at this

21   point, which I hope will be resolved by the issuance of

22   the permit.

23        Q.    Is that friction between you and

24   Mr. Zakitis?

25        A.    Correct.

1      Q.    When that friction is resolved, what are

2  your terms that you would intend to seek from Mr. Zakitis?

3      A.    I can't qualify what those terms would be,

4  but obviously I'm going to be hoping for the best

5  treatment of my creditors if we're involved in that

6  project, as well as the Maryland project.

7      Q.    Is Cannamed a Maryland corporation?

8      A.    Yes, and I think it may be an LLC.

9      Q.    And that LLC would have been organized in

10  the State of Maryland?

11      A.    Yes.

12      Q.    Does it have any involvement in the State of

13  Florida?

14      A.    No.

15      Q.    Has it ever done business in the State of

16  Florida?

17      A.    Well, it had its business offices here.

18      Q.    And where were those business office?

19      A.    At 525 South Flagler, fifth floor.

20      Q.    How long did they have those business

21  offices there?

22      A.    From their inception.

23      Q.    Which was when?

24      A.    I don't recall, you'd have to look at the

25  date of the filing of the LLC.

1          Q.     And the spelling of Cannamed, is that

2    C-a-n-a-m-e-d, or two Ns?

3          A.     Two Ns.

4          Q.     So C-a-n-n-a-m-e-d?

5          A.     Correct.

6          Q.     And that's a Maryland LLC, to the best of

7    your recollection?

8          A.     I know it is.

9          Q.     You know it is, okay.

10              MR. SWIFT:  No further questions.

11              MR. FURR:  Thank you.

12              Anyone else have any questions?

13              MR. ARESTY:  Max Aresty on behalf of Fred

14   Volkwein.

15              MR. FURR:  Like your father.

16              MR. ARESTY:  I apologize, but I'm not used

17   to these meetings --

18              MR. FURR:  Sure.

19              MR. ARESTY:  -- and I'm not really on top of

20   the case.  I was attending on behalf of my father.

21                         EXAMINATION

22   BY MR. ARESTY:

23          Q.     But regarding this Zakitis house, the

24   project house ---

25              MR. FURR:  Could you move over closer to the

1    table?

2              MR. ARESTY:  Yeah, yeah.

3              THE WITNESS:  Or you can come to the table.

4    Right, it's your table, but I presume he can sit here.

5              MR. FURR:  You can sit there.

6    BY MR. ARESTY:

7         Q.    Regarding the Zakitis house, is there a

8    reason why Frank Zakitis would enter into any kind of

9    agreement with you?  Does he owe you something?

10        A.    No, he owes me nothing, but he is a

11   businessman, on one hand, and he's got a big heart on the

12   other, and when the Maryland license wasn't issued to

13   Cannamed, I asked him if he could help me with some of

14   these projects.  So he ended up purchasing the loan that

15   New Wave had on the project house, and then eventually

16   foreclosed on it.  Actually it was in foreclosure.  So he

17   bought the foreclosure suit.

18        Q.    And he completed the foreclosure?

19        A.    Correct, and then bought it in a

20   foreclosure.

21        Q.    Did he go above his judgment amount to win

22   the bid?

23        A.    I don't recall.  I think he paid $1,100,000.

24   No, it was -- no, I can tell you the answer actually I

25   have it with me.  No, he's eligible to collect

1    approximately a $65,000 deficiency.

2         Q.    What was the amount of the judgment?

3         A.    Well, you can calculate it from what I think

4    he bought it for.  Well, rather than do that, obviously

5    you can check in public record.  I don't know.

6         Q.    You don't recall?

7         A.    Not really.

8         Q.    So if he was to strike a deal with you to

9    help assist your creditors after you get over this sticky

10   situation, would that be purely gratuitous?

11        A.    I would have to say yes.

12        Q.    The monies that were owed to Fred Volkwein

13   that you put in your schedule, can you tell me how you

14   came to that number?

15        A.    That was a number that I calculated and

16   published to Fred, it might have been as much two years

17   ago, I'm not sure.

18        Q.    So is it consistent with the ledger that

19   you're referring to?

20        A.    Yes.

21        Q.    And do you have any copies of that ledger?

22        A.    I don't know if I still do, but I'm sure

23   Fred has them.

24        Q.    And how were they sent to Fred?

25        A.    Handed to Fred at a meeting in my office.

1        Q.    Where they given to him in any other way?

2        A.    Not that I recall, no.

3        Q.    And did you keep any records, physical or --

4    this ledger, would you have physical copies, or would you

5    have digital copies?

6        A.    I had a physical copy.  It was handwritten,

7    and it was kept in a file with his name on it.

8        Q.    Okay.  So a physical copy only?

9        A.    I believe so, yeah.

10        Q.    And these were the records that you -- they

11    were removed from your office?

12        A.    Correct.

13        Q.    And this gentleman ---

14        A.    I believe were removed from my office.

15        Q.    And Mr. Gibson, you believe, is the one who

16    -- if they were removed, he's the one who removed them?

17        A.    Yes, I believe that because when I sent in

18    the van for them, by email, to an address that I know

19    belongs to him, I never received a response.

20        Q.    Okay.  So Mr. Gibson is unresponsive, and

21    his whereabouts are unknown at this time?

22        A.    Oh his whereabouts are perfectly known, he's

23    sitting right here.

24        Q.    Oh, okay, but he's been unresponsive?

25        A.    Correct.

1         Q.    Okay, and you said you were making some

2    amendments to your schedules, is that correct?

3         A.    I'm going to, yes.

4         Q.    And is ---

5         A.    Well, when you say your schedules, you mean

6    Chance & Anthem's schedules?

7         Q.    Chance & Anthem, yes.

8         A.    Yes.

9         Q.    Are you going to be amending any of the

10   entries relating to Mr. Volkwein?

11        A.    I hadn't intended to, no, but I guess if

12   Fred sits with me either individually or through your

13   firm, and can show me where my numbers are wrong, I would

14   amend based on his numbers if I thought they were correct.

15             MR. SWIFT:  Okay.  Thank you.

16             Mr. FURR:  Thank you.

17             Anybody else have any questions?

18             Yes, ma'am.

19             MS. WILLIAMS:  I'm Sophie Williams on behalf

20   of (inaudible) and Carl Stone.

21             MR. FURR:  (Inaudible.)

22                      EXAMINATION

23   BY MS. WILLIAMS:

24        Q.    Mr. Siskind, regarding your schedules for

25   Chance & Anthem, what materials did you use to prepare

Page 38

1    them without your records?

2          A.    I don't remember.

3          Q.    Did you go by memory?

4          A.    In part, yes.

5          Q.    Did you use any bank records?

6          A.    I don't recall what I used.

7          Q.    Would you use any handwritten records?

8          A.    I don't recall.  I said that three times

9    now.

10          Q.    Okay.  I'm trying to specify, hoping maybe

11    it will trigger your memory.

12                Okay.  So with respect to the $300,000 that

13    you mentioned for the lease to own on the property in

14    Maryland, where -- what was the origination of that

15    $300,000?

16          A.    I don't recall.

17          Q.    Would it have come from Mr. Stone?

18          A.    No.

19          Q.    Mr. Fiore?

20          A.    No.

21          Q.    Would it have come from either Diana or

22    Christopher George?

23          A.    No.  Diana George is not a creditor.  She

24    has no basis for being a creditor.

25                Christopher George loaned $2 million to

1    Sovereign Gaming (phonetic), which then assisted with the

2    funding of Cannamed, but they had no direct privity with

3    Cannamed.

4         Q.    How much of the money was used for Cannamed

5    funding?

6         A.    I have no idea.

7         Q.    And you said that was through Sovereign

8    Gaming?

9         A.    Right, there are two promissory notes, as

10   you well know, totalling $2 million, which

11   Christopher George (inaudible) loaning that money to

12   Sovereign Gaming.

13        Q.    I have seen purported copies of the

14   purported promissory notes.

15        A.    And you've also seen the release that

16   David Fiore signed.

17        Q.    I have seen the purported release, yes.

18        A.    And the affidavit which Carl Stone provided?

19        Q.    I am familiar with Mr. Stone's affidavit, if

20   we're talking about the same one.  I don't know if there

21   is another one I don't know about.

22        A.    So you really don't represent any valid

23   creditors in this bankruptcy, do you?

24             MR. FURR:  Mr. Siskind ---

25   BY MS. WILLIAMS:

1          Q.    Did you ---

2                MR. FURR:  -- she gets to ask the questions.

3    You don't.

4                THE WITNESS:  I just made the statement for

5    the record then.

6                MS. WILLIAMS:  All right.

7                THE WITNESS:  But, Mr. Trustee, I will also

8    state that I brought a listing of the valid creditors and

9    she's not one, her clients aren't one it.

10               MR. FURR:  All right.

11               MS. WILLIAMS:  I don't ---

12               THE WITNESS:  Mr. Neff is on it and

13   Mr. Volkwein is on it also.

14               MS. WILLIAMS:  I will say for the record

15   that my clients have been noticed with regard to the

16   Chance & Anthem bankruptcy matters, and that is why I'm

17   here.  So whether or not Chance & Anthem claims them to be

18   valid creditors I think is another issue.

19               MR. FURR:  That is another issue, and I

20   don't make that decision.

21               MS. WILLIAMS:  All right.  I don't have

22   any ---

23               MR. FURR:  There is a guy with a black robe

24   that does that.

25               MS. WILLIAMS:  I don't have any other

1  questions.  Thank you.

2           THE WITNESS:  Did you say guy or gal?

3           MR. FURR:  Guy.  Why, who is this one?

4           THE WITNESS:  It's a gal.

5           MR. FURR:  A gal.

6           Anybody else have any questions?

7           If all the lawyers would just give their

8  card to Mr. Suarez, if you don't mind, so we can get in

9  touch with you, we'll be glad to do that and share any

10 information with you if you want to.

11          All right.  This meeting is concluded.

12 Thank you very much.

13

14

15          (Thereupon, the 341 Meeting of Creditors was

16 concluded.)

17

18

19

20

21

22

23

24

25

Page 42

1

2                          CERTIFICATION

3

4    STATE OF FLORIDA        :

5    COUNTY OF MIAMI-DADE     :

6

7              I, Cheryl L. Jenkins, RPR, RMR, Shorthand

8    Reporter and Notary Public in and for the State of Florida

9    at Large, do hereby certify that the foregoing Section 341

10   Meeting of Creditors was transcribed by me from a digital

11   recording made on the date and at the place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record to the best

14   of my ability of said proceedings.

15              WITNESS my hand this 25th day of July, 2018.

16

17

18              _____

19              CHERYL L. JENKINS, RPR, RMR

20              Court Reporter and Notary Public
             in and for the State of Florida at Large
21                  Commission #GG 138863
                    December 27, 2021

22

23

24

25